SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| SAFEWAY INSURANCE COMPANY, INC., a foreign corporation, | ) Arizona Supreme Court ) No. CV-04-0146-PR |
| | ) |
| Plaintiff-Appellant, | ) Court of Appeals ) Division One |
| v. | ) No. 1 CA-CV 02-0661 |
| | ) |
| PETER A. GUERRERO, individually, PETER A. GUERRERO, P.C., an Arizona professional corporation; CHARLES D. ROUSH, individually, CHARLES D. ROUSH, P.C., an Arizona professional corporation; and ROUSH, MCCRACKEN, GUERRERO & MILLER, ATTORNEYS AT LAW, a partnership of professional corporations, | ) Maricopa County ) Superior Court ) No. CV 02-004495 ) ) **O P I N I O N** ) ) ) ) ) |
| | ) |
| Defendants-Appellees. | ) |
| | ) |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Margaret H. Downie, Judge

**AFFIRMED**

_____

Opinion of the Court of Appeals, Division One
207 Ariz. 82, 83 P.3d 560 (App. 2004)

**VACATED**

_____

Parrillo, Weiss & O'Halloran                              Tempe
     By: Ronald E. Huser
Attorneys for Plaintiff-Appellant

Turley, Swan & Childers, P.C.                            Phoenix
     By: Kent E. Turley

and

Haralson, Miller, Pitt, Feldman & McAnally, P.L.C.        Tucson
     By: Stanley G. Feldman
Attorneys for Defendants-Appellees

Law Office of JoJene Mills, P.C.                          Tucson
    By: JoJene E. Mills

and

Plattner Verderame, P.C.                                 Phoenix
    By: Richard S. Plattner
Attorneys for Amicus Curiae
Arizona Trial Lawyers Association

Law Offices of John L. Tully, P.C.                       Tucson
    By: John L. Tully

and

Law Offices of James D'Antonio                           Tucson
    By: James J. D'Antonio
Attorneys for Amicus Curiae
United Policyholders

**H U R W I T Z**, Justice

¶1      This case requires us once again to consider issues arising out of a *Morris* agreement.[1]   The question presented is

---

[1]      The term "*Morris* agreement" is generally used to describe a settlement agreement in which an insured defendant admits to liability and assigns to a plaintiff his or her rights against the liability insurer, including any cause of action for bad faith, in exchange for a promise by the plaintiff not to execute the judgment against the insured. *See United Servs. Auto. Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987).  Such an agreement can be prompted by a number of circumstances. *See, e.g., id*. at 115, 741 P.2d at 248 (involving an agreement entered into after reservation of rights by insurer); *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 735 P.2d 451 (1987) (involving an agreement entered into after alleged anticipatory breach of insurer's duty to indemnify); *Miel v. State Farm Mut. Aut. Ins. Co*., 185 Ariz. 104, 912 P.2d 1333 (App. 1995) (involving an agreement entered into after alleged bad faith failure to settle by insurer).  An agreement with these same characteristics entered in response to an insurer's refusal to defend the insured is generally referred to as a *Damron* agreement. *See Damron v. Sledge*, 105 Ariz. 151, 460 P.2d

whether attorneys who negotiate a *Morris* agreement on behalf of a plaintiff in a personal injury action can be subjected to liability to the defendant's insurer for intentional interference with contractual relations. We conclude that such a claim does not lie in this case.

## I.

¶2      This case arises out of an automobile accident in which Holly Castano suffered catastrophic injuries.[2] Castano's mother, Patricia Himes, was appointed as her conservator and retained Peter A. Guerrero of the firm of Roush, McCracken & Guerrero (collectively "Guerrero"), to handle Castano's personal injury claims. Steven Botma drove the car that caused the accident. Safeway Insurance Company ("Safeway") insured the vehicle that Botma was driving. The insurance policy provided coverage limits of $15,000 per person and $30,000 per accident.

---

997 (1969). We recognize that the cases sometimes use the terms "*Morris* agreement" and "*Damron* agreement" interchangeably. *See Himes v. Safeway,* 205 Ariz. 31, 34 n.2 ¶ 1, 66 P.3d 74, 77 (App. 2003). We refer to the agreement at issue in this case as a "*Morris* agreement" because it does not involve a refusal to defend.

[2]      As the court of appeals acknowledged, "Holly Castano's injuries were extremely severe." *Safeway Ins. Co. v. Guerrero,* 207 Ariz. 82, 84 ¶ 6, 83 P.3d 560, 562 (App. 2004). She "suffered a diffuse axonal injury to her brain which resulted in spastic quadreparesis," has "no use of her left arm or leg" and only limited use of her right arm and leg, and suffers from long term and short term memory problems. *Id.* The cost of her past and projected medical care has been estimated at $7 million. *Id.*

3

¶3     Guerrero made a settlement offer that included a demand of the $15,000 policy limits.  Guerrero later withdrew the offer, and then sued Botma and General Motors, the manufacturer of the car in which Castano was injured.  Safeway appointed counsel for Botma, who filed a counterclaim alleging that Safeway had accepted the settlement offer before it was withdrawn.  That issue was tried to a jury, which found that no settlement had been reached.  The court of appeals affirmed in a memorandum decision.

¶4     Shortly before the scheduled trial of the personal injury lawsuit, Himes and Botma entered into a *Morris* agreement under which Botma admitted liability in the amount of $12 million and assigned to Himes any claims that he had against his original counsel[3] and Safeway.  Safeway intervened in superior court to contest the amount of the settlement.  The superior court found the $12 million settlement reasonable.[4]

---

[3]     Himes later brought a malpractice suit against the first counsel Safeway assigned to Botma's case.  The superior court dismissed the complaint, holding that a legal malpractice claim cannot be assigned, and the court of appeals affirmed.  *Botma v. Huser*, 202 Ariz. 14, 39 P.3d 538 (App. 2002).

[4]     Safeway appealed the reasonableness determination, and the court of appeals reversed and remanded for further proceedings.  *Himes v. Safeway Ins. Co.,* 205 Ariz. 31, 66 P.3d 74 (App. 2003).  On remand, the superior court once again found the settlement reasonable.  Safeway again appealed, and the court of appeals affirmed that judgment in a memorandum decision.

¶5        After the *Morris* settlement, Safeway filed two lawsuits. The first, filed in federal court, sought a declaratory judgment that Botma had breached the cooperation clause of the insurance contract by entering into the *Morris* agreement.[5] Himes and Botma counterclaimed, alleging that Safeway had acted in bad faith by failing to accept the policy limits settlement offer. The district court granted summary judgment to Safeway, finding that the insurer had not acted in bad faith and that Botma therefore breached the cooperation clause of his insurance contract by signing the *Morris* agreement. *Safeway Ins. Co. v. Botma,* No. CIV-00-553-PHX-RCB (D. Ariz. Mar. 7, 2003) (order granting partial summary judgment). An appeal of that judgment is pending in the Ninth Circuit.

¶6        In the second suit, filed in superior court, Safeway sued Guerrero for intentional interference with contractual relations. The complaint alleged that Guerrero "devised a scheme" to induce Botma to admit liability and assign his bad faith claim against Safeway, in order to allow Guerrero to "receive a much larger fee." Safeway alleged that Guerrero induced Botma's breach of the cooperation clause by threatening Botma with a multi-million dollar judgment, manufacturing a bad

---

[5]    The clause provided: "A person claiming any coverage of this policy must . . . [c]ooperate with us and assist us in any matter concerning a claim or suit."

5

faith claim against Safeway through aborted settlement negotiations, and misrepresenting to Botma what had occurred during those negotiations.

**¶7**        Guerrero filed a motion for summary judgment.  The superior court granted the motion, holding that "on the undisputed facts, plaintiff's complaint fails as a matter of law."[6]  The court of appeals reversed, finding a genuine issue of material fact as to whether Guerrero engaged in improper conduct that could give rise to the intentional interference claim.  *Safeway Ins. Co. v. Guerrero*, 207 Ariz. 82, 95 ¶¶ 55-56, 83 P.3d 560, 573 (App. 2004) ("*Safeway*").

**¶8**        We granted Guerrero's petition for review because the case presents an issue of statewide importance and first impression.  We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") § 12-120.24 (2003).

---

[6]     Guerrero styled the motion as a "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment."  Safeway argues here, as it did in the court of appeals, that the superior court erred in treating the motion as one for summary judgment.  *See Safeway Ins. Co. v. Guerrero*, 207 Ariz. 82, 85 n.5 ¶ 11, 83 P.3d 560, 563 (App. 2004).  The court of appeals found it unnecessary to consider this procedural claim.  *Id*.  In light of Safeway's claim, we have considered in this opinion only the facts alleged in Safeway's complaint, facts established in the federal litigation (which both Safeway and Guerrero requested be the subject of judicial notice in the court of appeals), *see id.* at 83 ¶ 3, 83 P.3d at 561, and facts conceded by Safeway at oral argument.

6

¶9        *Morris* agreements are designed to reconcile the "conflicting interests" of an insured and a liability insurer in certain difficult situations.  *Parking Concepts v. Tenney*, 207 Ariz. 19, 22 ¶ 12, 83 P.3d 19, 22 (2004) (quoting *United Servs. Auto. Ass'n v. Morris*, 154 Ariz. 113, 117, 741 P.2d 246, 250 (1987)).  One such situation occurs when an insurer defends an insured against a claim by a third party but reserves the right to dispute whether the claim is covered under the policy.  While an insurer with a good faith policy defense has a right to dispute coverage, the insured is thereby placed in a "precarious position."  *Id*. (quoting *Morris*, 154 Ariz. at 118, 741 P.2d at 251).  Even though the insurer is providing a defense to the claim, the insured faces the possibility that any judgment, even one within policy limits, may not be covered by the policy.  *Id*.

¶10       In order to allow insureds to protect themselves from "the sharp thrust of personal liability," *Morris*, 154 Ariz. at 118, 741 P.2d at 251, we held that the cooperation clause of the insurance contract is not violated by a *Morris* agreement when the insurer defends under a reservation of rights.  *Id*. at 119, 741 P.2d at 252.  To protect the insurer, we place the burden on the insureds (or their assignees) to show that any *Morris* agreement is free of "fraud or collusion," *Parking Concepts*, 207

7

Ariz. at 22 ¶ 13, 83 P.3d at 22, and reasonable in amount, *id*. at ¶ 15.  If the insurer eventually succeeds in establishing that the claim is not covered by the policy, the insurer is not liable for any part of the settlement.  *Morris*, 154 Ariz. at 121, 741 P.2d at 254.

**¶11**    A similar situation arises when an insured is confronted with a claim that exceeds the limits of the insurance policy, and the insurer fails to accept an offer to settle within those limits.  The insurer owes the insured an implied contractual "duty to treat settlement proposals with equal consideration" to its interests and those of an insured.  *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 137, 735 P.2d 451, 459 (1987).  Failure to give such "equal consideration" is a breach of contract by the insurer that frees the insured from the contractual prohibition on settlement without the insurer's approval.  *Id*.  But when an insurer fails to settle a claim, the insured may be forced to proceed to trial on the claim before a final determination can be made as to whether the insurer acted in bad faith.  Use of a *Morris* agreement under such circumstances allows insureds to protect themselves against personal liability, while reserving to the insurer the ability to prove that its actions were not in bad faith.  If bad faith is not established, the *Morris* agreement will be a breach of the cooperation clause and the insurer will

be excused from any duty to pay the stipulated judgment, no matter how reasonable the amount. *See State Farm Mut. Auto. Ins. Co. v. Peaton*, 168 Ariz. 184, 192-93, 812 P.2d 1002, 1010-11 (App. 1990).

**B.**

¶12    This case involves a *Morris* agreement premised on Safeway's alleged bad faith failure to settle. However, the federal district court has held that Safeway did not act in bad faith in handling the Castano claim against Botma. Unless that holding is overturned by the federal courts, it follows that Botma breached his duty to cooperate with the insurer by entering into the *Morris* agreement.

¶13    We have "long recognized" that a person who intentionally interferes with contractual relationships between other parties can be held liable under certain circumstances to a party injured by the interference. *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust*, 201 Ariz. 474, 493 ¶ 74, 38 P.3d 12, 31 (2002). Safeway's complaint alleges that Guerrero intentionally interfered with Safeway's contractual relationship with Botma by inducing Botma to enter into the *Morris* agreement.

¶14    The tort of intentional interference with contractual relations requires a plaintiff to prove:

9

> (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly.

*Id.* The opinion below focused solely on the fifth element, whether Guerrero "acted improperly." *Safeway*, 207 Ariz. at 92 ¶ 41, 83 P.3d at 570. Because it found a genuine issue of material fact as to this element, the court of appeals reversed the superior court's summary judgment and remanded for trial. *Id.* at 95 ¶¶ 55-56, 83 P.3d at 573.

### III.

### A.

¶15 Guerrero argues that lawyers acting on behalf of their clients hold a qualified privilege from liability for tortious interference with contractual relations. In tortious interference cases, however, this Court long ago rejected the "formalistic privilege concept in favor of a requirement that an interference be 'improper' for liability to attach." *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 388, 710 P.2d 1025, 1043 (1985).[7] This approach is consistent with the general rule that lawyers have no special privilege against

---

[7] Although *Wagenseller* rejected a "formalistic privilege" approach, we subsequently noted that the requirement that the defendant's interference be improper "covers essentially the same ground as 'privilege.'" *Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 34, 730 P.2d 204, 213 (1986).

civil suit. *See* Restatement (Third) of Law Governing Lawyers § 56 (2000) (stating that, with limited exceptions, "a lawyer is subject to liability to a client or nonclient when a nonlawyer would be in similar circumstances").[8] The court of appeals therefore correctly focused on whether Guerrero "acted improperly" and not on whether the lawyers were "privileged" to interfere in the contractual relationship between Safeway and Botma.

**B.**

¶16      In analyzing the "improper conduct" issue, the court of appeals began from the premise that "[t]here is no such thing as an unconditional, absolute right to a *Damron/Morris* agreement." *Safeway*, 207 Ariz. at 90 ¶ 34, 83 P.3d at 568. Rather, it reasoned, "[b]efore such an agreement can be entered, an insurer must have breached its duty to the insured." *Id.* If, as the district court found, Safeway did not breach any contractual duty to Botma, then the *Morris* agreement in this case was "outside the permitted parameters." *Id*. at 91 ¶ 39, 83

---

[8]      Contrary to Guerrero's assertions, recognition of such a privilege is not necessary to promote unfettered advice from counsel to client. Lawyers' advice *to their own clients* to breach a contract already lies outside the general scope of this tort. *See* Restatement (Third) of Law Governing Lawyers § 57(3); *Am. Family Mut. Ins. Co. v. Zavala*, 302 F. Supp. 2d 1108, 1121 (D. Ariz. 2003) (holding that attorney, as agent for a client, generally cannot tortiously interfere with a contract to which the client is a party).

11

P.3d at 569.  The court of appeals concluded that counsel who negotiate such agreements "do so at their peril."  *Id.*

¶17     To the extent that the opinion below suggests that the "improper conduct" element of tortious interference can be established simply by a finding that Safeway did not breach its contractual duties to Botma, we disagree.  A conclusion that Safeway did not act in bad faith merely establishes that Botma breached his contract with the insurer by entering into the *Morris* agreement.  This finding is quite relevant in proving the third element of intentional interference – that the interference induced or caused a breach of contract.  It cannot, however, also satisfy the fifth element – that the actor's conduct was improper.

¶18     Such a holding would largely negate the utility of *Morris* agreements in cases of an alleged bad faith failure to settle.  If claimants' counsel were exposed to tort liability for intentional interference whenever the bad faith claim against the insurer is ultimately unsuccessful, lawyers would be unwilling to negotiate *Morris* agreements in failure-to-settle cases any time there was a possibility that the bad faith claim would fail.  Insureds facing ruinous personal liability would thus be deprived of this important means of protection.

¶19     The court of appeals also suggested that "improper conduct" could be found from evidence that Guerrero negotiated

12

the *Morris* agreement knowing that the insurer had not breached its duty to give equal consideration to Botma's interests. *See id*. at 94 ¶ 51, 83 P.3d at 572. But this is simply another way of saying there was evidence that Guerrero knew that Botma would breach his contract with Safeway by entering the *Morris* agreement. Such a showing may be relevant to establishing that Guerrero intended to induce the breach. *See Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 33, 730 P.2d 204, 211 (1986) ("The tort is intentional in the sense that [the defendant] must have intended to interfere with the [plaintiff's] contract or have known that this result was substantially certain to be produced by its conduct.") (citations omitted).[9]

**¶20** However, proof that an actor intentionally induced a breach of contract is not sufficient to establish that the actor's conduct was improper. Rather, "there is a requirement that the interference be *both* intentional and improper." Restatement (Second) of Torts § 767 cmt. a (1979) (emphasis

---

[9] Guerrero's knowledge that Safeway had not acted in bad faith might be relevant to a claim that a bad faith suit brought against the insurer under a *Morris* assignment of claims was wrongfully instituted. *See Bradshaw v. State Farm Mut. Auto. Ins. Co.,* 157 Ariz. 411, 417, 758 P.2d 1313, 1319 (1988) (holding that inquiry into an individual's subjective belief in the merits of a claim is one of two prongs testing whether a suit was brought "without probable cause" for purposes of a claim of wrongful institution of civil proceedings); *cf. Wolfinger v. Cheche*, 206 Ariz. 504, 509-10 ¶¶ 26-27, 80 P.3d 783, 788-89 (App. 2003) (applying modified *Bradshaw* test in light of First Amendment concerns). Safeway, however, has not raised such a claim.

added).  "If the interferer is to be held liable for committing a wrong, his liability must be based on more than the act of interference alone.  Thus, there is ordinarily no liability absent a showing that defendant's actions were improper as to motive or means."  *Wagenseller*, 147 Ariz. at 388, 710 P.2d at 1043.

¶21     While the "intentional" element of tortious interference focuses on the mental state of the actor, *see Snow*, 152 Ariz. at 33, 730 P.2d at 211, the "improper" element in contrast "generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded," *id.* at 34, 730 P.2d at 212 (citations omitted).  Our case law thus emphasizes that a plaintiff must show more than the defendant's knowledge that his or her conduct would induce a breach to establish intentional interference with contractual relations.  *See, e.g., id.* (stating that a defendant properly may interfere intentionally with another's contract by appropriate means to protect an interest of the defendant) (citing Restatement (Second) of Torts § 773); *Strojnik v. Gen. Ins. Co. of Am.*, 201 Ariz. 430, 437-38 ¶¶ 28-30, 36 P.3d 1200, 1207-08 (App. 2001) (holding that insurer did not improperly interfere with plaintiff's prospective contractual relationship with insured by entering a defense and indemnification agreement to prevent insured from

14

entering a *Morris* agreement with plaintiff); *cf. Middleton v. Wallichs Music & Entm't Co.*, 24 Ariz. App. 180, 183, 536 P.2d 1072, 1075 (1975) (stating that mere fact of prior knowledge by new tenant of restrictive covenant in lessor's lease with existing tenant, which covenant was necessarily violated by lessor's lease with new tenant, did not make new tenant's signing of lease agreement with lessor an "improper inducement" of lessor's breach of contract with existing tenant).[10] "Improper" conduct thus cannot be established in this case by evidence that Guerrero knew Safeway had not acted in bad faith in failing to reach a settlement.

## c.

¶22      Our inquiry does not end here, however, because Safeway also contends that Guerrero acted with an improper

---

[10]      Cases from other jurisdictions are in accord. *See, e.g., Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 623 (10th Cir. 1995) (finding that operator of nuclear weapons production facility did not engage in "improper conduct" by intentionally hiring away industrial hygienists from its subcontractor); *Conoco Inc. v. Inman Oil Co.*, 774 F.2d 895, 907 (8th Cir. 1985) (rejecting tortious interference claim by distributor where "[t]he interference was clearly intentional" but not improper; interference resulted from oil supplier bidding low for the conceded purpose of winning customer contract away from distributor); *Mason v. Wal-Mart Stores, Inc.*, 969 S.W.2d 160, 166 (Ark. 1998) (finding no "improper conduct" in retailer's use of economic pressure to persuade manufacturer to eliminate its contract with independent representative and thus deal directly with retailer); *C.R. Bard, Inc. v. Wordtronics Corp.*, 561 A.2d 694, 697 (N.J. Super. Ct. Law Div. 1989) ("It is not improper to give truthful information to a customer about someone else's product, and this is so even if the purpose is to interfere with an existing or prospective contractual relationship.").

15

motive and employed three types of improper means. The purportedly improper motive was Guerrero's desire to garner increased attorneys' fees. The allegedly improper means were (1) offering to settle Himes' claim and then withdrawing from settlement negotiations to "manufacture[]" a bad faith claim against Safeway, (2) threatening Botma with multi-million dollar personal liability, and (3) misrepresenting facts to induce Botma to sign the *Morris* agreement. To determine whether such allegations constitute "improper conduct" for purposes of this tort, we consider seven factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Wells Fargo*, 201 Ariz. at 494 ¶ 81, 38 P.3d at 32 (quoting Restatement (Second) of Torts § 767). We give the greatest weight to the first two factors, the nature of the defendant's conduct and the defendant's motive. *Id*.

### 1.

¶23    We start with Guerrero's alleged improper motive. There is no dispute that Guerrero negotiated the *Morris* agreement with Botma as part of an effort to pursue a larger monetary award for Himes, and that such an award would in turn

16

result in a larger contingent fee to Guerrero. However, we cannot conclude that lawyers have an improper motive simply because they seek to increase their fees by maximizing an award for a client. *See* Restatement (Third) of Law Governing Lawyers § 57 cmt. g ("So long as the lawyer acts or advises with the purpose of promoting the client's welfare, it is immaterial that the lawyer hopes that the action will increase the lawyer's fees . . . ."); *cf. Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 328 (9th Cir. 1982) (holding that attorney's mixed motive to benefit both his client and himself does not make attorney's intent "improper"). Otherwise, every lawyer working under a contingency fee agreement would have an improper motive when negotiating a *Morris* agreement. There is no allegation in this case that Guerrero was motivated by a desire to injure Safeway or vent "ill will" against the insurer. *See* Restatement (Second) of Torts § 767 cmt. d. The lawyers' profit motive therefore cannot establish that their actions were "improper."

**2.**

¶24 We turn next to Safeway's allegation that Guerrero acted improperly by withdrawing the settlement offer before the insurer had rejected it, thus "manufacturing" a bad faith claim. This argument necessarily rests on the premise that, once having made the $15,000 settlement offer, Himes was obligated to settle her multi-million dollar claim against Botma for this sum, and

17

that Guerrero's subsequent decision to withdraw the offer was thus somehow wrongful. But this position is simply untenable. A jury has determined that Safeway did not accept the offer, and in the absence of such an acceptance, Guerrero was free to withdraw the offer for any reason, or for no reason at all.

**3.**

¶25      Nor did Guerrero act improperly by threatening Botma with multi-million dollar liability in the personal injury lawsuit. Given the serious injuries suffered by Castano and the unchallenged evidence of Botma's liability, Guerrero was entitled to bring the case to trial, even if the suit would have imposed ruinous financial liability on the defendant. The threat of an adverse verdict and personal liability was undoubtedly a critical factor motivating Botma to enter into the *Morris* agreement. But Himes and her attorneys were perfectly entitled to pursue that course of action, and the "threat" to do so cannot be improper conduct.

¶26      As the Restatement explains, bringing a civil suit is an improper inducement to breach a contract only when the suit itself is brought in bad faith:

> The use of these weapons of inducement (civil suits) is ordinarily wrongful if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication.

18

Restatement (Second) of Torts § 767 cmt. c.  Safeway does not allege that Guerrero lacked belief in the merit of Himes' claim against Botma or that the lawyers sued Botma for any purpose other than to bring the claim to definitive adjudication.

**4.**

¶27    Finally, Safeway alleges that Guerrero acted improperly by misrepresenting to Botma facts regarding the settlement negotiations with Safeway.[11]   Phrased differently, Safeway alleges that Guerrero misled Botma into believing that Safeway acted in bad faith in its failure to reach a settlement to protect Botma from personal liability.[12]

---

[11]   Safeway's complaint alleged that Guerrero falsely represented to Botma that no settlement was reached between Safeway and Himes and that Safeway had made "no reasonable attempt" to settle Castano's claim.  While we assume the truth of these allegations for purposes of this appeal, it is worth noting that a superior court jury found that no settlement was reached between Safeway and Himes, a judgment that was affirmed on appeal. Moreover, the alleged statement that Safeway's settlement efforts were not "reasonable" is largely a legal conclusion, as opposed to a pure statement of fact. Safeway also alleged that Guerrero secreted documents from Botma concerning the settlement negotiations.  This allegation is analytically no different than Safeway's allegation that Guerrero made factual misrepresentations to Botma's counsel regarding Safeway's efforts to settle.

[12]   It may seriously be questioned whether any such acts caused Botma to enter the *Morris* agreement.  After Safeway failed to settle the claim and refused to indemnify Botma for any judgment in excess of the policy limits, he faced the likely potential of personal liability for a multi-million dollar judgment.  It is difficult to believe that any statement by Guerrero about Safeway's willingness to settle would have had any effect on

19

¶28   Fraudulent misrepresentation or concealment can, under certain circumstances, constitute "improper conduct" for purposes of the intentional interference tort. *See* Restatement (Second) of Torts § 767 cmt. c. But, as the Restatement teaches, the propriety of the means employed by the interferer is determined in light of the particular circumstances of the case. *Id.* Even such means as "physical violence, fraudulent misrepresentation and threats of illegal conduct" may not constitute "improper conduct" for purposes of the intentional interference tort in light of the particular "relation between the actor and the person induced." *Id.*

¶29   It is uncontested in this case that the negotiations concerning the *Morris* agreement took place entirely between Guerrero and Botma's counsel. *See id.* (stating that the "manner of presenting an inducement" may be a significant consideration in determining whether conduct was wrongful).[13] Botma was represented at all times by lawyers appointed by Safeway. We

---

Botma's desire to enter into an agreement protecting him against personal liability to Himes. However, we assume *arguendo*, given the procedural posture of this case, that Guerrero's alleged misrepresentations did induce Botma to sign the agreement.

[13]   "The question of who was the moving party in the inducement" is also relevant. Restatement (Second) of Torts § 767 cmt. c. Although there is some dispute in this case about who first raised the possibility of a *Morris* agreement, it is not contested here that Botma's lawyer made the ultimate approach to Guerrero that resulted in the negotiation of the *Morris* settlement.

20

have emphasized that "a special relationship exists between the insurer and the counsel it assigns to represent its insured." *Paradigm Ins. Co. v. Langerman Law Offices*, *P.A.*, 200 Ariz. 146, 154 ¶ 28, 24 P.3d 593, 601 (2001).

¶30    Given this "special relationship," we cannot conclude that an insurer may base a claim for tortious interference with contract on misstatements of fact made by a claimant's lawyer to an insurer-appointed adverse counsel regarding actions of the insurer itself during settlement negotiations.[14] Guerrero's alleged misrepresentations were made to a lawyer who had been hired by and presumably had regular contact with Safeway, and who thus had ample ability and opportunity to inquire of the insurer as to precisely what happened during the settlement discussions. Indeed, an insurer must be given advance notice of a proposed *Morris* agreement, *Morris*, 154 Ariz. at 119, 741 P.2d at 252, and Safeway does not contest that it received

---

[14]   We have no occasion to consider today whether defense counsel in this case owed a duty of care to Safeway. *See Paradigm Ins. Co.*, 200 Ariz. at 150 ¶ 16, 24 P.3d at 597 (recognizing that when conflict exists between client and the insurer, counsel's duty "is exclusively owed to the insured"). We hold only that the relationship between the insurer and defense counsel here was such that Guerrero's alleged misrepresentations to counsel about what occurred during settlement negotiations between Guerrero and the insurer cannot give rise to a claim for tortious interference with contract.

21

appropriate notice here.[15] If Safeway wanted to dispel any false impression by Botma that the insurer had acted in bad faith, it had full opportunity to provide Botma and his counsel with whatever facts or documents were necessary to do so.

¶31     A party to a lawsuit generally may not premise a fraud claim on alleged misrepresentations by adverse counsel. *See Linder v. Brown & Herrick*, 189 Ariz. 398, 405, 943 P.2d 758, 765 (App. 1997) ("[A]s a matter of law and common sense, they had no right to rely on statements made by the attorneys opposing them."). It would make no sense to hold that the alleged representations here nonetheless can subject Guerrero to liability to an insurer who employed the lawyer to whom the representations were made. Like Botma, Safeway could not have reasonably relied on Guerrero to provide defense counsel with a thorough or objective assessment of the reasonableness of Safeway's efforts to settle on behalf of its insured. Therefore, any alleged misstatements by Guerrero in that context

---

[15]     Nearly three months before Botma signed the *Morris* agreement, Botma's Safeway-appointed attorney notified Safeway that Botma would enter a *Morris* agreement if the insurer would not promise to indemnify him for any judgment in excess of the policy limits. Safeway refused. According to the defense counsel's deposition, a Safeway claims manager instead suggested that Botma declare bankruptcy if a judgment were entered against him.

are not the sort of improper conduct that can give rise to liability for intentional interference with contract.[16]

**D.**

¶32    Safeway argues in its brief that if it is not allowed to sue for intentional interference with contractual relations under the facts of this case, "all attorneys will believe that they can behave improperly and suffer absolutely no consequences from their actions."    But our decision today does not condone any alleged misbehavior by Guerrero; we merely hold that the alleged behavior is not the sort of improper conduct that gives rise to a suit for tortious interference with contractual relations.    Our holding that the defendants here are not liable for this intentional tort does not provide an incentive for

---

[16]    Guerrero argues that the absolute privilege for defamatory statements made during judicial proceedings should protect the lawyers from liability here. *See Green Acres Trust v. London*, 141 Ariz. 609, 613, 688 P.2d 617, 621 (1984) (outlining the privilege); Restatement (Third) of Law Governing Lawyers § 57 cmt. c ("The privilege is also a defense to other claims where publication or communication is an element of the claim . . . ."). The court of appeals declined to hold that the privilege applies only to defamation claims, but nonetheless rejected Guerrero's argument, reasoning that it was the lawyers' conduct, not their statements, that gave rise to the intentional interference claim. *Safeway*, 207 Ariz. at 88-89 ¶¶ 27-30, 83 P.3d at 566-67. Because we find nothing improper in the lawyers' non-speech conduct, such a privilege might be relevant to determining whether the lawyers acted "improperly" by allegedly misrepresenting to Botma's lawyer Safeway's attempts to settle the case. *See supra* note 7. However, because we conclude that the communications in this case do not constitute "improper conduct" for purposes of the intentional interference tort, we need not explore the boundaries of the litigation-defamation privilege.

23

improper conduct. To the contrary, existing law already provides ample deterrence to lawyer misbehavior.

¶**33** Lawyers face severe jeopardy for deceit in litigation. Rule 11 of the Arizona Rules of Civil Procedure subjects lawyers making false statements in litigation to sanctions such as payment of an adversary's expenses and fees. Lawyers who make misrepresentations also face professional discipline. *See* Ariz. R. Sup. Ct. 42, ER 3.3(a) (prohibiting a lawyer from making a false statement of fact to a tribunal); *id*. R. 53(a) (providing that violations of a rule of professional conduct are grounds for discipline); *id.* R. 60 (providing for sanctions ranging from censure to disbarment for professional misconduct by an attorney).

¶**34** The case law governing *Morris* agreements also provides ample deterrence against "manufactured" bad faith claims. As noted above, if there has been no reservation of rights or bad faith by the insurer, the execution of the *Morris* agreement will constitute a breach of contract by the insured, and thus will relieve the insurer of any liability to indemnify the insured. Plaintiff's counsel therefore have every incentive to avoid creating what the court of appeals called "*Damron/Morris* agreements outside the permitted parameters." *Safeway*, 207 Ariz. at 91 ¶ 39, 83 P.3d at 569. If counsel negotiate such agreements, the result will be that their clients can collect

24

neither from the defendant (who will have received a covenant not to execute) nor from the insurer.

¶35    Moreover, the law already provides powerful disincentives against bringing suit on improperly "manufactured" bad faith claims.  Lawyers who pursue frivolous bad faith claims not only face sanctions under Rule 11, but also may be required to pay the insurer's attorneys' fees and expenses under A.R.S. § 12-349.[17]  Even when the bad faith action is not groundless, the losing party faces the potential of a fee award under A.R.S. § 12-341.01.  *See Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 544, 647 P.2d 1127, 1142 (1982) (concluding that an action alleging insurance bad faith is one "arising out of contract" within the meaning of § 12-341.01(A)).[18]  Counsel who bring bad faith claims without just cause are also exposed to liability for wrongful institution of civil proceedings.  *See, e.g., Lane v. Terry H. Pillinger, P.C.*, 189 Ariz. 152, 939 P.2d 430 (App. 1997) (involving suit for wrongful institution of civil proceedings brought by officer of insurer against lawyer who sued insurer and officers for bad faith).  Lawyers who bring frivolous claims also may be subject to professional discipline.

---

[17]    The federal analogue to A.R.S. § 12-349 is 28 U.S.C. § 1927.  The district court rejected Safeway's claim that Guerrero should pay fees and costs under that provision.

[18]    Indeed, such an award was made against Himes in the federal litigation.

*See* Ariz. R. Sup. Ct. 42, ER 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a good faith basis in law and fact for doing so that is not frivolous . . . ."); *id*. R. 53(a) (providing that violations of a rule of professional conduct are grounds for discipline); *id*. R. 60 (providing for sanctions for misconduct).

**IV.**

¶36     For the reasons above, we vacate the opinion of the court of appeals and affirm the judgment of the superior court dismissing Safeway's complaint.

_____
Andrew D. Hurwitz, Justice

CONCURRING:


_____
Charles E. Jones, Chief Justice


_____
Rebecca White Berch, Justice


_____
Michael D. Ryan, Justice


_____
John Pelander, Judge*

_____

*The Honorable Ruth V. McGregor recused herself; pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable John Pelander, Chief Judge of the Arizona Court of Appeals, Division Two, was designated to sit in her stead.

26