FILED

OCT 13 2016

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No. AZ-15-1364-JuFL |
| | ) | |
| LE KWAK LE and VINH TRONG LE, | ) | Bk. No. 2:11-bk-05893-MCW |
| | ) | |
| Debtors. | ) | Adv. No. 2:11-ap-00727-MCW |
| _____ | ) | |
| LE KWAK LE; VINH TRONG LE, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | **M E M O R A N D U M**[1] |
| | ) | |
| THOMAS Q. HUYNH, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Argued and Submitted on September 23, 2016
at Phoenix, Arizona

Filed - October 13, 2016

Appeal from the United States Bankruptcy Court for the
District of Arizona

Honorable Madeleine C. Wanslee, Bankruptcy Judge, Presiding
_____

Appearances:    Christopher James Piekarski of Piekarski &
Brelsford, P.C. argued for appellants Le Kwak Le
and Vinh Trong Le; Neal H. Bookspan of Jaburg &
Wilk, P.C. argued for appellee Thomas Q. Huynh.
_____

Before: JURY, FARIS, and LAFFERTY, Bankruptcy Judges.

_____

    [1] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

-1-

Appellee Thomas Q. Huynh (Mr. Huynh) filed an adversary complaint against appellants, Le Kwak Le (Ms. Le) and Vinh Trong Le (collectively, Debtors), seeking a declaration that a potential debt owed to him by Ms. Le was nondischargeable under § 523(a)(6).[2]  After a trial, the bankruptcy court found that Ms. Le's conduct, which included the unauthorized liquidation and closing of a business that she jointly owned with Mr. Huynh, was willful and malicious within the meaning of § 523(a)(6).  As a result of Ms. Le's conduct, the court found that Mr. Huynh suffered lost profit damages in the amount of $864,000 and entered a nondischargeable judgment in favor of Mr. Huynh for that amount.  This appeal followed.  For the reasons set forth below, we VACATE and REMAND.

## I.  FACTS[3]

### A.  Prepetition Events

On November 17, 2004, Mr. Huynh and his wife, Am T. Ta, formed Power Car Wash and Foodmart, LLC, an Arizona limited liability company (LLC), for the purpose of operating a gas station, car wash, and retail store located in Mesa, Arizona (Gas Station).  The management of the LLC was vested in its members, Mr. Huynh and Ms. Ta, who operated the Gas Station from

---

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[3] We borrow from the bankruptcy court's statement of facts set forth in its Order Re: Nondischargeability of Debt entered September 30, 2015, and from the facts set forth in the parties' Joint Pretrial Statement.

-2-

their domicile in Northern California. Because the business was operated remotely, Mr. Huynh used a password protected on-line video and accounting system with sixteen cameras to enable his distant surveillance of the premises. Mr. Huynh personally owned the land on which the Gas Station was built and he leased the property to the LLC. The Gas Station was branded by Chevron.

In early March 2006, Ms. Ta agreed to sell her membership interest in the LLC to Ms. Le. On March 31, 2006, Ms. Ta and Ms. Le executed the LLC Membership Interest Purchase Agreement (Interest Purchase Agreement), whereby Ms. Ta sold to Ms. Le 500 membership interests in the LLC, representing one-half of the outstanding membership interests. The purchase price was $500,000 for the Gas Station and approximately $100,000 for the inventory. Mr. Huynh retained the remaining 50% membership interest in the LLC. The operating agreement was subsequently amended to include Ms. Le as a member.

Around the same time that Ms. Le purchased the inventory and her 50% membership interest in the LLC, she and Mr. Huynh entered into a membership agreement pertaining to the operation and management of the LLC (Membership Agreement). Section 3.4 of the Membership Agreement provided that "[Ms.] Le [was to] be the sole party to participate in the day-to-day management of the business of the Partnership." It also provided that Mr. Huynh was to be available to "cooperate with [Ms. Le] when needed per [Ms. Le's] request including providing business consultation or representation," and that "[a]ll matters to be determined by the members shall be determined by affirmative

-3-

vote of a majority in interest of the members." The Membership Agreement further stated that the Gas Station proceeds would be disbursed according to a sliding scale and were separate and apart from the regular business expenses of the LLC. Finally, under the agreement, each member had the right to inspect the books, records, reports and accounts of the LLC during normal business hours.

At the beginning of 2006, before Ms. Le acquired her interest in the LLC, Mr. Huynh renegotiated and amended the real property lease between himself and the LLC (Amended Lease). Ms. Le was aware of the existence of the Amended Lease and of its terms at the time she entered into both the Interest Purchase Agreement and the Membership Agreement.

From March 31, 2006, the date that Ms. Le purchased her interest in the LLC, until approximately February 2009, Ms. Le operated the Gas Station without incident.

In February 2009, the parties and their counsel began addressing certain issues including, among others, accounting issues regarding the LLC dating back to the 2006 tax year and Ms. Le's failure to pay the rent for the LLC's use of the real property. The letter writing between counsel went on for an extended period of time, until late 2010.

On November 10, 2010, counsel for Mr. Huynh, as landlord, sent a letter to Ms. Le due to the non-payment of rent (Demand Letter). Mr. Huynh proposed several options:

> 1.    If Mrs. LE is willing to sell her LLC membership interest, then Mr. HUYNH is willing to buy her interests for the appraised value of the inventory, including gasoline stock at wholesale;

-4-

> 2. In the alternative, if Mrs. LE is willing to buy Mr. HUYNH's LLC membership interests, then Mr. HUYNH is willing to sell his interests at no cost to her; and
>
> 3. As it pertains to both offers, the amount of back rent owing will be calculated and Mrs. LE's fifty percent (50%) outstanding balance will be either credited against the value of the inventory, or the outstanding balance will still be owing to Mr. HUYNH.

The letter requested that Ms. Le communicate her decision in writing no later than 5:00 p.m., November 17, 2010. The letter further advised Ms. Le that if she did not respond, Mr. Huynh would proceed with an unlawful detainer proceeding to recover possession of the premises.

Ms. Le did not respond to the Demand Letter. Instead, the undisputed facts show that she held a "going out of business" sale and liquidated all the inventory and the gas which belonged to the LLC and closed the Gas Station on November 17, 2010, all without notice to Mr. Huynh.

The LLC and Chevron were parties to a Chevron Retailer Supply Contract that required the Gas Station to continuously operate. On November 24, 2010, after the Gas Station was closed for seven days, Chevron terminated the Chevron Retailer Supply Contract and debranded the Gas Station for breach of the provision requiring the Gas Station to remain operating.

On Friday, December 3, 2010, Mr. Huynh, as landlord of the real property and building leased by the LLC, locked out the LLC for its continuing failure to pay rent pursuant to the terms of the Amended Lease. Although he attempted to rebrand the Gas Station, he was unable to do so. Several months after Ms. Le closed the station, Mr. Huynh reopened it as an unbranded

-5-

station. The business eventually failed and the lender on the underlying property foreclosed.

Mr. Huynh filed a lawsuit in the Maricopa County Superior Court titled Huynh v. Le, et al., CV2011-000456, seeking to recover damages for loss of the Gas Station business and the real property. That lawsuit was stayed when Debtors filed for bankruptcy protection on March 9, 2011.

**B.    Bankruptcy Events:   The Adversary Proceeding**

On April 15, 2011, Mr. Huynh filed an adversary complaint against Debtors seeking a declaration that the debt, as of yet unliquidated, owed to him due to Ms. Le's wrongful conduct was nondischargeable under § 523(a)(4) and (a)(6). Mr. Huynh alleged that Ms. Le wrongfully (1) shut off his access to the Gas Station's accounting and video system, to which he usually had access on-line; (2) demanded capital contributions from him, while at the same time preventing him from having access to financial information regarding the Gas Station; and (3) sold the inventory and closed the Gas Station without giving notice to him, all in violation of the Membership Agreement. As a result of these acts, Mr. Huynh alleged that he lost the Gas Station business and the underlying property. He sought actual and punitive damages for the loss.

Debtors answered the complaint and then moved for summary judgment on both claims for relief. The bankruptcy court granted Debtors' motion, in part, as to the § 523(a)(4) claim.

On January 21, 2015, the bankruptcy court held a trial on the § 523(a)(6) claim for relief. Mr. Huynh and his expert, Scott Evans, testified at trial, as did Ms. Le.

-6-

Much of Mr. Huynh's testimony was focused on the debranding of the Gas Station which happened due to Ms. Le's shut down of the business. He testified that it would have been difficult, if not impossible, to reopen the Gas Station within the seven-day period after Ms. Le shut it down to avoid the debranding by Chevron. He explained that he was initially denied physical access by Ms. Le and her counsel. He further explained that after he gained access, he found the Gas Station empty of any usable contents; the station had no inventory, computers, books, records or vendor lists. Mr. Huynh testified that the computer used to run the convenience store and keys which were used to run different equipment were missing.

Mr. Huynh also testified that by debranding the Gas Station, Chevron removed all its trademarks from the facility. He further explained that operating an unbranded gas station was more expensive due to price fluctuations with the gas. Finally, he testified that by using the Chevron brand, it was Chevron who bore the loss due to any fraudulent use of credit or debit cards as opposed to the owner of an unbranded station.

Mr. Huynh stated that he sought to obtain branding from other gasoline companies. He was unsuccessful because the Gas Station was closed for three months. Mr. Huynh testified that he eventually reopened the Gas Station a few months later without any branding, but it ultimately failed. Without income from the Gas Station, Mr. Huynh explained that he was unable to pay the carrying costs on the real property and it was sold at a foreclosure sale.

Mr. Huynh also testified that he and his wife were liable

to Chevron under a personal guaranty with respect to a debranding fee of approximately $38,000. Mr. Huynh said that he also still owed the Small Business Administration (SBA) over $770,000 with respect to the loan on the underlying property. The SBA attempted to garnish his wages, but Mr. Huynh explained that he was not earning enough money to actually have any wages garnished. Finally, Mr. Huynh repeatedly testified that he believed had Ms. Le not closed the Gas Station, he would not have lost the Chevron branding or the underlying property.

After Mr. Huynh's testimony, Scott Evans testified about Mr. Huynh's damages. Mr. Evans opined that the business was substantially impacted by the debranding in addition to the shut down. In his opinion, if the station had remained branded, it would have been in a better financial position than as an unbranded station. He further opined that Mr. Huynh's actual damages totaled approximately $368,000 and his future damages, taken conservatively five years out from the closure, were $496,000.

Ms. Le then testified. She testified that she had the computer that had all the information on it to operate the business in her possession away from the store. She said that she did not know the shut down would harm Mr. Huynh because she thought he could simply reopen the business. However, later she admitted that she testified at her deposition that she knew shutting down the business would harm Mr. Huynh financially.

Ms. Le further testified that she was aware of the Chevron branding contract and that Mr. Huynh and his wife had guarantees to Chevron at the time she shut down the Gas Station. However,

-8-

she explained that she did not know about debranding and did not know that by shutting down the Gas Station that debranding would happen. She also admitted to knowing that Mr. Huynh had a loan on the real property.

In responding to questions from Mr. Huynh's counsel regarding whether she knew the shut down would harm Mr. Huynh, she repeatedly stated that Mr. Huynh could simply reopen the business: "What I think is that when I shut down he can reopen it. He had a lot of money and he can buy the inventory back and put everything back. . . . I did not think he would default on the loan because he do have a lot of money." Ms. Le also admitted that she had other options besides closing the business. However, she testified that she did not respond to the Demand Letter sent by Mr. Huynh's attorney, she did not talk to Mr. Huynh directly or through his attorney, and she never told Mr. Huynh that she was going to shut down the business.

After the trial, the bankruptcy court issued a decision and order finding that Mr. Huynh had proven the requirements of § 523(a)(6) by demonstrating that Ms. Le's wrongful conduct consisting of, among other things, the unauthorized liquidation and closing of the Gas Station was willful and malicious and caused him injury. The court also concluded that Mr. Huynh suffered lost profit damages in the amount of $864,000 due to Ms. Le's willful and malicious conduct. The bankruptcy court entered a nondischargeable judgment in favor of Mr. Huynh for

-9-

that amount.  Debtors timely appealed from that judgment.[4]

## II.  JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(I).  We have jurisdiction under 28 U.S.C. § 158.

## III.  ISSUES

Did the bankruptcy court err in granting judgment for Mr. Huynh under § 523(a)(6)?

Did the bankruptcy court err in calculating Mr. Huynh's lost profit damages in the amount of $864,000?

## IV.  STANDARDS OF REVIEW

"Because the bankruptcy court entered its judgment after trial, we review the bankruptcy court's findings of fact for clear error, and its conclusions of law de novo."  Thiara v. Spycher Brothers (In re Thiara), 285 B.R. 420, 426 (9th Cir. BAP 2002) (citing Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002)).

---

[4] Mr. Huynh named Ms. Le and Mr. Le in his complaint and the nondischargeable judgment is against both of them.  There is nothing in the record that shows Mr. Le participated in Ms. Le's conduct nor did the bankruptcy court make any findings pertaining to Mr. Le's conduct and the elements of § 523(a)(6).  Generally, a spouse's subjective malicious intent cannot be imputed to the debtor for § 523(a)(6) purposes.  See In re Jenkins, 2015 WL 735799 (9th Cir. BAP Feb. 20, 2015) (citing Luc v. Chien (In re Chien), 2008 WL 8240422, at *7 (9th Cir. BAP Feb. 7, 2008)); cf. Sachan v. Huh, 506 B.R. 257 (9th Cir. BAP 2014).  However, nowhere did Debtors argue this point in the bankruptcy court nor did they object to the judgment on this basis.  Moreover, they never argued that the bankruptcy court erred by entering judgment against Mr. Le in this appeal.  Accordingly, those arguments are deemed waived for purposes of this appeal.  Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999).

-10-

A court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record. United States v. Hinkson, 585 F.3d 1247, 1261-62 & n. 21 (9th Cir. 2009) (en banc) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 577 (1985)) (explaining that the clearly erroneous standard of review is an element of the clarified abuse of discretion standard). On appeal, we give "due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses." In re Thiara, 285 B.R. at 426. "This deference is also given to inferences drawn by the trial court." Id.

"The bankruptcy court's conclusions of law regarding nondischargeability, as well as its interpretation of state law, are reviewed de novo." Id. We also review de novo the bankruptcy court's application of the legal standard in determining whether a debt resulting from Debtors' wrongful conduct is dischargeable as a willful and malicious injury. Id.

Whether the bankruptcy court properly awarded lost profit damages to Mr. Huynh in the amount of $864,000 is governed by Arizona law. We review state law legal issues de novo. Id.

## V. DISCUSSION

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The willful and malice requirements are analyzed separately and both elements must be met. In re Su, 290 F.3d at 1146-47; Ormsby v. First Am. Title Co. of Nev. (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010).

Whether a debtor acted willfully is a subjective inquiry:

-11-

the "willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." In re Ormsby, 591 F.3d at 1206. Further, when determining the debtor's intent under § 523(a)(6), there is a presumption that the debtor knows the natural consequences of his actions. Id.

"'A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" In re Su, 290 F.3d at 1146-47. "Malice may be inferred based on the nature of the wrongful act." In re Ormsby, 591 F.3d at 1206.

Although the bankruptcy court found that Ms. Le breached the Membership Agreement by unilaterally liquidating the inventory and closing the business, "it is well settled that a simple breach of contract is not the type of injury addressed by § 523(a)(6)." Snoke v. Riso (In re Riso), 978 F.2d 1151 (9th Cir. 1992). However, when an intentional breach of contract is accompanied by tortious conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6). Lockerby v. Sierra, 535 F.3d 1038, 1040-42 (9th Cir. 2008) (citing Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1205 (9th Cir. 2001) ("[a]n intentional breach of contract is excepted from discharge under § 523(a)(6) only when it is accompanied by malicious and willful tortious conduct.")).

Under Jercich, courts are instructed to first consider whether the debtor's conduct was "tortious," and then ask whether the debtor's conduct was both "willful" and "malicious."

-12-

*In re Jercich*, 238 F.3d at 1206-09. Whether a breach of contract is tortious is determined under state law. *Lockerby*, 535 F.3d at 1041 ("[C]onduct is not tortious under § 523(a)(6) simply because injury is intended or 'substantially likely to occur,' but rather is tortious if it constitutes a tort under state law.") (citing *Jercich*, 238 F.3d at 1206). We thus can only affirm if Ms. Le's conduct would constitute a tort under Arizona law. *Lockerby*, 535 F.3d at 1041.

In its findings, the bankruptcy court did not address the threshold issue as instructed in *Jercich*; i.e., whether Ms. Le's conduct was tortious under Arizona law. Indeed, the only place we found a tort mentioned in the record was in Mr. Huynh's counsel's closing argument. There, he argued that Ms. Le's unilateral decision to liquidate the gas and inventory and shut down the Gas Station was not only improper under the Membership Agreement, but also equated to tortious interference with contract under Arizona law. While we are free to affirm on any ground supported by the record, we think it more appropriate to remand the case to the bankruptcy court, for two reasons.

First, the bankruptcy court's findings do not clearly include all of the elements of intentional interference with contract under Arizona law. To establish a prima facie claim for tortious interference with contract, a plaintiff must show "(1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly."

-13-

*Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1025 (Ariz. 2005). The Arizona Supreme Court has stated that:

> While the 'intentional' element of tortious interference focuses on the mental state of the actor, the 'improper' element in contrast generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded. Our case law thus emphasizes that a plaintiff must show more than the defendant's knowledge that his or her conduct would induce a breach to establish intentional interference with contractual relations.

*Id.* at 1026–27 (internal citations and quotation marks omitted). To ascertain whether the defendant's actions were "improper," courts must consider:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 32 (Ariz. 2002).

Second, there is no indication that the parties discussed or argued the applicability of this tort, or any other tort, during the course of this adversary proceeding or at trial. Therefore, we leave the question of whether Ms. Le's conduct was tortious under Arizona law to the bankruptcy court to address in the first instance - if appropriate - based on the evidence presented at trial. *See Paskaly v. Seale*, 506 F.2d 1209, 1211 n.4 (9th Cir. 1974) (noting that the appellate court could affirm on any ground supported by the record as long as the parties had the opportunity to discuss in it in their appellate

-14-

briefs); <u>Bogey v. Ford Motor Co.</u>, 538 F.3d 352, 355 (5th Cir. 2008) ("Although we have the authority to consider grounds presented to but not ruled upon by the district court, we decline to do so because the plaintiffs did not address the various other grounds in their briefing, and we think the better course is for the district court to address those issues in the first instance."); <u>see also</u> <u>Lohoti v. Vericheck, Inc.</u>, 586 F.3d 1190, 1196 (9th Cir. 2009) ("Although we may affirm on 'any ground supported by the record, even if it differs from the [bankruptcy] court's rationale,' where it is unclear whether the [bankruptcy] court relied on proper law, we may vacate the judgment and remand with instructions to apply the correct legal standard.").

## VI.  CONCLUSION

Accordingly, we VACATE the judgment in favor of Mr. Huynh and REMAND to the bankruptcy court so that it may consider whether Ms. Le's conduct was tortious under Arizona law.