# IN THE
# ARIZONA COURT OF APPEALS
### DIVISION ONE

FIDELITY NATIONAL TITLE INSURANCE COMPANY, in its corporate capacity and as successor by merger to Lawyers Title Insurance Corporation and Commonwealth Land Title Insurance Company,
*Plaintiff/Appellant*,

*v.*

CENTERPOINT MECHANIC LIEN CLAIMS, LLC, an Arizona limited liability company, *Defendant/Appellee.*

ML MANAGER, LLC; as manager of CENTERPOINT I LOAN, LLC; and CENTERPOINT II LOAN, LLC; and as authorized agent for ROBERT L. BARNES, a single man; HAROLD CHRIST, LTD, an Arizona corporation; CHARLES GOLDSTEIN, M.D., Trustee of Charles Goldstein Emergency Services, PC Section 401(k) Profit Sharing Plan and Trust Agreement effective December 10, 2007; PENNY HARDAWAY INVESTMENTS, LLC, an Arizona limited liability company; MORRIS A. KAPLAN, Trustee of the Goldman and Kaplan Ltd., Defined Benefit Plan under agreement dated December 31, 2001; G. GRANT LYON, Trustee for Radical Bunny, LLC, an Arizona limited liability company; SARAH A. LISA-PETRAUSCHKE and BRIAN M. PETRAUSCHKE, husband and wife; LORINDA S. MCMULLEN and LAURA MARTINI, as joint tenants with right of survivorship; and FREDERICK A. TAUNTON and DALE C. TAUNTON, Trustees of the Taunton Family Trust dated January 18, 2007,
*Defendants/Appellees/Cross-Appellants*,

*and*

CENTERPOINT MECHANIC'S LIEN CLAIMS LLC,
*Intervenor/Appellee/Cross-Appellant.*

*and*

UNIVERSAL-SCP 1 LP; and VRCP FUNDING, LP, *Defendants/Appellees.*

*v.*

FIDELITY NATIONAL TITLE INSURANCE COMPANY,
*Intervenor/Appellant/Cross-Appellee.*

Nos. 1 CA-CV 12-0721 and 1 CA-CV12-0726 (Consolidated)
FILED 8-27-2015

---

Appeal from the Superior Court in Maricopa County
Nos. CV2011-015738, CV2008-024849, CV2008-032460, CV2009-036739,
CV2009-036821, CV2009-036828 and CV2009-036861

The Honorable Randall H. Warner, Judge
The Honorable Edward O. Burke, Judge *Retired*

**REVERSED**

---

COUNSEL

Jones Skelton & Hochuli, PLC, Phoenix
By Lori L. Voepel, Robert R. Berk, Jennifer B. Anderson
*Counsel for Fidelity National Title Insurance Company and Commonwealth Land Title Insurance Company*

Perkins Coie, LLP, Phoenix
By Richard M. Lorenzen, Philip R. Higdon, Rusty D. Crandell
*Counsel for Centerpoint Mechanic Lien Claims, LLC*

Moyes Sellers & Hendricks, Phoenix
By Keith L. Hendricks, Joshua T. Greer
*Counsel for ML Manager, LLC, et al.*

Tiffany & Bosco, PA, Phoenix
By J. Lawrence McCormley
*Counsel for Universal –SCP 1 LP and VRCP Funding, LP*

Haralson Miller Pitt Feldman & McAnally, PLC, Tucson
By Stanley G. Feldman

Noel Fidel Attorney at Law, Phoenix
By Noel Fidel
*Co-counsel for Amicus Curiae American Land Title Association*

**OPINION**

Presiding Judge Kent E. Cattani delivered the opinion of the Court, in which Judge Margaret H. Downie and Judge Michael J. Brown joined.

C A T T A N I, Judge:

¶1          In this case, we address whether a title insurance company is liable under *United Services Automobile Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987), for damages agreed to by its insureds in a settlement agreement resolving third-party mechanics' lien claims against the insureds' interest in a real estate development.  Under *Morris*, when an insurer agrees to defend its insured against a third-party liability claim, but reserves the right to challenge coverage under the insured's policy, the insured may independently settle with the third-party claimant without violating the insured's duty of cooperation under the insurance contract; this settlement may assign to the claimant the insured's rights against the insurer, subject to the insurer's retained right to contest coverage.

¶2          Here, the settlement agreement was not between the insureds and the third-party mechanics' lien claimants, but was rather an agreement between the insureds and an entity they controlled that had purchased the mechanics' lien claims.  Moreover, the settlement agreement was for an amount significantly greater than the amount paid to purchase the mechanics' lien claims.  Accordingly, and for reasons discussed below, we conclude that the settlement agreement between the insureds and the entity that purchased the mechanics' lien claims was not a compliant *Morris* agreement, and we accordingly reverse the superior court's ruling that the amount of the insurer's liability (if it loses the yet to be litigated coverage dispute) is the negotiated settlement amount.

**FACTS AND PROCEDURAL BACKGROUND**

**I.     Parties and Title Insurance Policies.**

¶3          In March 2007 and early April 2008, Mortgages, Ltd., a private lender, agreed to loan a developer additional funds to build Centerpoint, a high-rise residential condominium development in Tempe. Construction on the project had begun in December 2005, and a portion of the loan was used to pay off an earlier loan from Freemont Investment

and Loan ("Freemont") secured by a deed of trust, with the balance used to fund construction. The loan was secured by a deed of trust against Centerpoint. A predecessor to Fidelity National Title Insurance Company ("Fidelity") issued a title insurance policy insuring priority of Mortgages, Ltd.'s deed of trust for a face amount of $165,200,000 (the "ML Policy").

¶4 Two months after issuing the loan, Mortgages, Ltd. went into bankruptcy. As part of its bankruptcy reorganization plan, Mortgages, Ltd.'s Centerpoint deed of trust interests were transferred to two investors—Centerpoint I Loan, LLC ("CPI") and Centerpoint II Loan, LLC ("CPII")—and eight individual fractional interest holders. ML Manager, LLC acted as manager of CPI and CPII, as well as agent and attorney-in-fact for the fractional interest holders. We refer to ML Manger, CPI, CPII, and the fractional interest holders collectively as "ML Investors."

¶5 In April 2010, ML Investors purchased Centerpoint at a trustee's sale for a credit bid of $8 million. Soon thereafter, CPI and CPII purchased a parking lot adjacent to Centerpoint. Fidelity issued a title insurance policy to CPI and CPII for the parking lot (the "Parking Lot Policy") for the amount of the purchase price, $875,000.

¶6 Universal-SCP 1, LP ("Universal") contemporaneously provided CPI and CPII a bankruptcy exit loan of $20 million, secured in part by CPI and CPII's Centerpoint assets. Commonwealth Land Title Insurance Company ("Commonwealth") issued Universal a $5 million exit lender title policy insuring priority of its security interest in Centerpoint (the "Universal Policy").

¶7 CPI and CPII also obtained a $5 million loan from VRCP Funding, LP ("VRCP"), used in part to purchase the parking lot. The VRCP loan was secured by a deed of trust on Centerpoint and the parking lot, and Commonwealth issued VRCP a $5 million lender title policy insuring priority of its deed of trust (the "VRCP Policy").

## II. Mechanics' Lien Litigation.

¶8 Funding for the Centerpoint project became erratic during construction, which eventually stalled. Starting in April 2008, subcontractors and suppliers began to record mechanics' liens and notices of *lis pendens* against Centerpoint. The first of eventually dozens of mechanics' lien foreclosure claims was filed in October 2008, asserting that the mechanics' liens had priority over Mortgages, Ltd.'s (subsequently ML Investors') security interest in Centerpoint.

¶9        ML Investors tendered the defense of the mechanics' lien claims to Fidelity, and in September 2009, Fidelity accepted the defense with a general reservation of rights and engaged counsel to represent ML Investors. Counsel asserted that ML Investors, as Mortgages, Ltd.'s assignees, were entitled to be equitably subrogated to the priority position held by Freemont, whose loan Mortgages, Ltd.'s initial loan had paid off and whose deed of trust undisputedly had priority over the mechanics' liens. In September 2010, the superior court denied summary judgment on equitable subrogation, finding issues of fact as to whether there was an agreement to subrogate at the time of Mortgages, Ltd.'s loan and whether Mortgages, Ltd. was at fault for failing to fund the loan while encouraging continued construction and representing that funding was forthcoming. The ruling further determined the validity and amount of several mechanics' liens, although it left the issue of priority for trial.

¶10       After the summary judgment ruling, Fidelity reaffirmed its general reservation of rights under the ML Policy. In December 2010, Fidelity accepted the defense of CPI and CPII under the Parking Lot Policy, again with a reservation of rights. Universal and VRCP tendered their defense against the mechanics' lien claims to Commonwealth, which accepted with a reservation of rights in December 2010.

¶11       Meanwhile, ML Investors were considering selling the Centerpoint property, which was incurring ongoing security, maintenance, and other expenses during the pendency of the lawsuit. In addition to attempting to recoup at least part of their investment, ML Investors were also under pressure to liquidate Centerpoint to fund payments on the Universal exit loan, which risked substantial default penalties if not cured.

¶12       In September 2010, ML Investors contracted to sell Centerpoint for $30 million. The sale failed to close in October as planned, at least in part due to Fidelity's decision, in the wake of the summary judgment ruling, not to provide a title policy to the buyer that would insure priority over the mechanics' liens.

¶13       ML Investors concurrently pursued settlement negotiations with the mechanics' lien claimants. After the summary judgment ruling, the claimants insisted on a cash settlement, rather than an assignment of ML Investors' title insurance claims. ML Investors needed money from the potential sale of Centerpoint to fund the settlement, but the sale could not be completed without first settling the mechanics' liens claims to enable the buyer to receive clear title. Beginning in October 2010 and

continuing until the eventual sale of Centerpoint in January and February 2011, ML Investors informed Fidelity that they were seeking a potential *Morris* settlement directly with the mechanics' lien claimants.

### III. Sale and Settlement.

¶14 After extensive negotiations, ML Investors, Universal, VRCP, the buyer, and the mechanics' lien claimants reached a global agreement in February 2011 (as memorialized in November 2011) to sell Centerpoint and settle the mechanics' lien claims. Concerned that Fidelity would deny coverage if ML Investors simply paid the liens (thus clearing title) or if ML Investors—rather than a third party—purchased the liens (under the merger doctrine), the investors created a new entity, Centerpoint Mechanic Lien Claims, LLC ("CMLC"), which was wholly owned and controlled by CPII, to acquire the mechanics' lien claims and, later, to pursue the title insurance claims against Fidelity.

¶15 Under the global agreement, the buyer purchased Centerpoint for $30 million. To provide clear title to the buyer, CMLC purchased the mechanics' liens for $13.65 million and agreed to subordinate its interest in Centerpoint to the buyer's fee interest. Additionally, Universal and VRCP subordinated their interests in Centerpoint to that of the buyer. As a failsafe, CMLC agreed to a liquidated damages provision requiring it to pay $38 million to the buyer if CMLC failed to release the mechanics' liens within three years.

¶16 ML Investors waived $13.5 million of their proceeds from the sale for CMLC to use to purchase the mechanics' liens. They further set aside $3 million from the sale as CMLC's litigation reserve to pursue title insurance claims. ML Investors also waived their right to proceeds from the sale of the parking lot. Additionally, CPII purchased VRCP, and Universal and VRCP waived their claims to $5 million each from the sale proceeds and subordinated their interests in Centerpoint to that of the buyer.

¶17 The global agreement provided that once CMLC had been substituted for the mechanics' lien claimants, CMLC and ML Investors would enter a stipulated judgment for $38 million and a declaration that the mechanics' liens had priority over ML Investors' interest in Centerpoint. CMLC would accept assignment of ML Investors' claims against Fidelity, would agree not to execute against ML Investors, and would pursue title insurance claims directly against Fidelity. The

agreement included a plan to distribute any money recovered from Fidelity to ML Investors.

## IV. Intervention and Judgment.

**¶18** In the wake of the February 2011 agreement, CMLC substituted itself for the mechanics' lien claimants in the ongoing litigation. Fidelity and Commonwealth intervened to challenge the settlement agreement. After a five-day hearing, the superior court ruled that (1) the settlement agreement was valid under *Morris*, (2) the agreement was neither fraudulent nor collusive, (3) Fidelity had received proper notice of the settlement, and (4) the settlement amount was reasonable. The court thus found the settlements of the claims against Fidelity's ML Policy ($24,583,799.38 plus $1,880,994.51 in mechanics' lien attorney's fees) and Parking Lot Policy ($875,000) and on Commonwealth's Universal Policy ($5 million) and VRCP Policy ($5 million) "were reasonable, prudent, and fully supported by the evidence produced at the hearing" and entered judgment in favor of ML Investors, Universal, VRCP, and CMLC.

**¶19** The superior court thereafter denied Fidelity's motion for new trial. The court also denied as premature CMLC and ML Investors' requests for attorney's fees, concluding that they were not yet successful parties within the meaning of Arizona Revised Statutes ("A.R.S.") § 12-341.01 because the insurance coverage issue remained pending. Fidelity, but not Commonwealth, timely appealed, and CMLC and ML Investors timely cross-appealed.

## V. Companion Intentional Interference Case.

**¶20** In a companion case, Fidelity and Commonwealth sued CMLC for intentional interference with contract, alleging that CMLC had intentionally interfered with the title insurance contracts by entering into the *Morris*-type agreement. The superior court dismissed the case on the basis that it had previously found that the Insureds did not breach the insurance contracts by entering into the settlement agreement. Fidelity and Commonwealth timely appealed.

¶21 We have jurisdiction over these consolidated cases under A.R.S. § 12-2101(A)(1).[1]

## DISCUSSION

¶22 Fidelity argues that, as a matter of law, a title insurance policy holder may not enter a *Morris* agreement. Fidelity and amicus curiae American Land Title Association assert that, unlike the *third-party* insurance claim at issue in *Morris*, the policies here provide insurance for a *first-party* property loss, meaning loss caused by alleged defects that, if established, could lessen the value of the insureds' property. We need not address this argument, however, because even assuming *Morris* applies to title insurance claims, under the circumstances presented here, the settlement agreement is not a compliant *Morris* agreement.

## I. Settlement Agreements Under *Morris*.

¶23 As a general rule, an indemnitor with a duty to defend its indemnitee has the right and obligation to provide a defense against any third-party claim potentially within its indemnity obligation. *See Morris*, 154 Ariz. at 117, 741 P.2d at 250. "[B]y defending all claims the [indemnitor] obtains the advantage of exclusively controlling the litigation," including settlement with the third-party claimant. *Id.* Under these circumstances, the indemnitee is contractually bound by a cooperation clause to participate and aid the indemnitor in the defense, and may not independently settle with the claimant without breaching this contractual duty. *Id.*

¶24 The situation changes if the indemnitor accepts the defense, but reserves its right to contest coverage.[2] An indemnitor may "appropriately perform its contractual duty to defend while simultaneously reserving the right to later assert the defense," provided the indemnitor asserts the potential coverage defense in good faith. *Parking Concepts, Inc. v. Tenney*, 207 Ariz. 19, 22, ¶ 12, 83 P.3d 19, 22 (2004).

---

[1] Absent material revisions after the relevant date, we cite a statute's current version.

[2] A related, but distinct, doctrine applies where the indemnitor declines the indemnitee's tender of the defense. *See Damron v. Sledge*, 105 Ariz. 151, 460 P.2d 997 (1969).

¶25        In *Morris*, the court noted that an insurer's reservation of rights places an insured in a "precarious position." 154 Ariz. at 118, 741 P.2d at 251. The insureds in that case faced "the possibility of a jury verdict greater than their [] policy limit or, even if within the limit, one that might not be covered." *Id.* The insureds were thus entitled "to act reasonably to protect themselves from 'the sharp thrust of personal liability.'" *Id.* (quoting *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 137, 735 P.2d 451, 459 (1987)); *see also Damron*, 105 Ariz. at 153, 460 P.2d at 999 (quoting *Critz v. Farmers Ins. Grp.*, 41 Cal. Rptr. 401, 408 (Ct. App. 1964)); *Tenney*, 207 Ariz. at 22, ¶ 13, 83 P.3d at 22. *Morris* thus held that "[t]he [indemnitor]'s reservation of the privilege to deny the duty to pay relinquishes to the [indemnitee] control of the litigation." 154 Ariz. at 119, 741 P.2d at 252. And an indemnitee may then independently settle with a third-party claimant without breaching the indemnitee's contractual cooperation obligation. *Id.*; *see also Tenney*, 207 Ariz. at 22, ¶ 13, 83 P.3d at 22.

¶26        Under a typical *Morris* agreement, the insured agrees to allow judgment to be entered against it in exchange for a covenant not to execute, and assigns its rights under the policy to the claimant, who then pursues the insurer. *Tenney*, 207 Ariz. at 22, ¶¶ 14, 15, 83 P.3d at 22. Because this type of covenant not to execute insulates the indemnitee from potential liability, neither party to the settlement has an incentive to minimize the stipulated judgment amount. *Id.* at ¶ 14. In fact, by contemporaneously assigning its right to sue the insurer for bad faith, the insured can potentially bind the insurer to a stipulated judgment in excess of policy limits. *Leflet v. Redwood Fire & Cas. Ins. Co.*, 226 Ariz. 297, 300, ¶ 13, 247 P.3d 180, 183 (App. 2011).

¶27        To protect the indemnitor, *Morris* announced several limitations on an insured's right to enter into such an agreement. The insured must (1) "provide notice to the insurer," (2) "demonstrate that the settlement was free from fraud and collusion," and (3) "prove that the settlement amount is reasonable." *Leflet*, 226 Ariz. at 300, ¶ 14, 247 P.3d at 183 (citing *Morris*, 154 Ariz. at 119–20, 741 P.2d at 252–54). Reasonableness turns on "what a reasonably prudent person in the [indemnitee's] position would have settled for on the *merits* of the claimant's case" in light of the circumstances affecting liability, defense, and coverage. *Tenney*, 207 Ariz. at 23, ¶ 15, 83 P.3d at 23 (quoting *Morris*, 154 Ariz. at 121, 741 P.2d at 254). This inquiry attempts to re-create "what would have occurred if there had been an arm's-length negotiation between interested parties." *Himes v. Safeway Ins. Co.*, 205 Ariz. 31, 38–39, ¶¶ 22–23, 66 P.3d 74, 81–82 (App. 2003).

¶28          "The overarching goal of *Morris* is to permit the insured and the insurer to balance their competing interests in an atmosphere of fairness and defined risk—not to promote the transformation of underlying contract and tort claims into bad faith claims at inflated values." *Leflet*, 226 Ariz. at 301, ¶ 15, 247 P.3d at 184.  Thus, a *Morris* agreement that falls "outside the permitted parameters" is unenforceable. *Safeway Ins. Co. v. Guerrero*, 210 Ariz. 5, 15, ¶ 34, 106 P.3d 1020, 1030 (2005).

¶29          Here, we conclude that the settlement agreement between the insured and the entity that purchased the lien claims falls outside the permitted parameters of *Morris*.  Rather than representing an arm's length settlement between lien claimants and insureds, the purported *Morris* agreement in this case was between the insureds and an entity they controlled.  The lien claimants—the parties whose claims created the insureds' potential liability—were not parties to the agreement.  Instead, ML Investors interposed CMLC, which was wholly owned and controlled by CPII, as a purported proxy for the lien claimants.  Thus, the interests of the parties to the settlement agreement, CMLC and ML Investors, were aligned, not divergent.  *Compare Leflet*, 226 Ariz. at 301, ¶ 17, 247 P.3d at 184 (noting that a *Morris* agreement generally settles a dispute between opposing parties).

¶30          Moreover, by assigning their claims to the insureds' entity, the lien claimants effectively settled their claims unconditionally for a fixed sum, leaving no risk of excess liability for the insureds.  This is particularly significant because the insureds no longer faced the risk of personal liability that motivates a *Morris* agreement.  And having settled with the lien claimants, ML Investors' remedy against Fidelity was instead to seek reimbursement under the insurance contract, and if appropriate, to pursue a potential bad faith claim based on Fidelity's allegedly improper reservation of rights.  Given these circumstances, the settlement agreement—even if economically prudent from ML Investors' perspective—was not a compliant *Morris* agreement.

¶31          The circumstances in this case are in stark contrast to those in cases in which *Morris* agreements have been upheld, where such agreements resolve outstanding adverse claims by third-party claimants who accept an assignment of the insured's claims against the insurer and/or partial payment for stipulated liability.  *See, e.g., Morris*, 154 Ariz. at 118, 741 P.2d at 251; *Tenney*, 207 Ariz. at 22, ¶¶ 11–15, 83 P.3d at 22.  In those cases, the *Morris*-type agreement with third-party claimants operated to protect the insured against the "sharp thrust of personal liability."  In contrast, here, the agreement at issue was not a protection

against potential liability; that liability had already been resolved through a settlement with the lien claimants.

¶32        The unity of parties and lack of remaining risk of liability are further reflected in the artificially inflated judgment—$38 million despite the underlying settlement with the lien claimants for $13.65 million—entered pursuant to the purported *Morris* agreement. CMLC and ML Investors argue that although the lien claimants settled their claims in their entirety, ML Investors still faced greater economic risk. But this argument conflates *Morris*'s discussion of "personal liability" with overall economic or financial risk, which here included ML Investors' potential loss of their investment due to foreclosure of the mechanics' liens.

¶33        As relevant here, Fidelity's title policies insured only against loss stemming from the priority of the mechanics' liens over ML Investors' interest in Centerpoint. The policies did not otherwise guaranty the value of the property or that the insureds could complete the sale of Centerpoint in February 2011 (even accepting that it was in the insureds' interests generally to do so).

¶34        Because a *Morris* agreement cannot expand the insured's rights under the insurance contract, *Tenney*, 207 Ariz. at 24, ¶ 25, 83 P.3d at 24, the only loss for which Fidelity was potentially liable was the cost to the insureds of the mechanics' liens' priority, *i.e.*, the $13.65 million paid to acquire the mechanics' lien claims. Thus, the relevant "arm's-length negotiation" occurred in this case between the mechanics' lien claimants and the insureds, *see Himes*, 205 Ariz. at 39, ¶ 23, 66 P.3d at 82, and the subsequent agreement between CMLC and ML Investors for a judgment in an amount almost three times what was paid for the liens goes beyond ML Investors' established liability and beyond Fidelity's potential liability under the insurance contract.

¶35        Moreover, the stipulated judgment exceeded ML Investors' liability in scope as well as amount. The judgment's award to the insureds of the mechanics' lien claimant's attorney's fees illustrates this point. Because the insureds did not pay the mechanics' lien claimants any sum for attorney's fees, those fees cannot reasonably be considered a loss incurred due to a defect in title. The insureds may not, by using CMLC as a proxy, artificially inflate Fidelity's indemnity obligation to nearly three times the price actually paid.

¶36        In sum, the purported *Morris* agreement bound parties whose interests aligned, after the actual opposing party had settled for a

fixed sum, and stipulated to a judgment that exceeded actual liability both in scope and amount. We thus conclude that the agreement does not fit within the parameters of a *Morris* agreement.

¶37 Because of our resolution of this issue, we need not address Fidelity's alternative arguments attacking the agreement and stipulated judgment. Similarly, this conclusion renders moot CMLC and ML Investors' cross-appeal from the superior court's order denying their requests for attorney's fees as premature.

## II. Intentional Interference Claims.

¶38 Fidelity and Commonwealth appealed from the superior court's dismissal of their companion case asserting a claim that CMLC intentionally interfered with Fidelity's insurance contracts and induced the insureds to breach their contracts by improperly entering a *Morris* agreement. The superior court dismissed this claim on the basis of issue preclusion, ruling that, because the purported *Morris* agreement was found to be reasonable and not fraudulent or collusive, the insureds did not breach the insurance contracts by entering the agreement.

¶39 Because we vacate the judgment as against Fidelity, issue preclusion no longer bars the intentional interference claim. Accordingly, we reverse the judgment dismissing Fidelity's claim in CV 2011-015738 and remand for further proceedings. Because the stipulated judgment remains in effect as against Commonwealth, however, and because Commonwealth has stated no alternative grounds for reversing dismissal, we affirm the judgment dismissing Commonwealth's intentional interference claim.

## III. Attorney's Fees on Appeal.

¶40 All parties seek awards of attorney's fees expended on appeal pursuant to A.R.S. § 12-341.01. In an exercise of our discretion, we decline to award fees to any party.

## CONCLUSION

¶**41** Based on the foregoing, we reverse the decision of the superior court and remand for further proceedings consistent with this opinion.



Ruth A. Willingham · **Clerk of the Court**
F I L E D : ama