IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

───────────

**CENTERPOINT MECHANIC LIEN CLAIMS, LLC,**
*Plaintiff/Appellant/Appellee,*

*v.*

**COMMONWEALTH LAND TITLE INSURANCE COMPANY,**
*Defendant/Appellee/Appellant.*

───────────

No. CV-23-0164-PR
Filed June 10, 2025

───────────

Appeal from the Superior Court in Maricopa County
The Honorable Christopher Whitten, Judge
No. CV2011-008600
**REMANDED WITH INSTRUCTIONS**

Opinion of the Court of Appeals, Division One
255 Ariz. 261 (App. 2023)
**AFFIRMED IN PART, VACATED IN PART**

───────────

COUNSEL:

Richard M. Lorenzen (argued), RMLaw/PC, Phoenix, Attorney for Centerpoint Mechanic Lien Claims, LLC

Robert R. Berk (argued), Eileen Dennis GilBride, Charles M. Callahan, Jones, Skelton & Hochuli P.L.C., Phoenix; and David M. Satnick, Loeb & Loeb LLP, New York, New York, Attorneys for Commonwealth Land Title Insurance Company

Matthew G. Kleiner, Gordon Rees Scully Mansukhani, LLP, Phoenix, Attorneys for Amicus Curiae American Land Title Association

───────────

JUSTICE BOLICK authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ, and JUSTICES BEENE, MONTGOMERY, BRUTINEL (Ret.), and BERCH (Ret.)[1] joined.

_____

JUSTICE BOLICK, Opinion of the Court:

¶1        This case is the latest chapter in the lengthy litigation saga attributable to the collapse of construction financer Mortgages Ltd. ("ML"); the multitude of mechanics' liens placed on unfinished construction projects that ML was funding; title insurance to protect investors who loaned money to ML to keep the construction projects afloat; and the title insurance claims made because the mechanics' liens had priority over the investors' deeds of trust.

¶2        Although the case is fact-intensive, some general legal principles govern. We hold that (1) under the terms of the title insurance policy issued to the lenders in this case, only losses attributable to a failure to repay the loans are covered, so that where (as here) the loans were fully repaid, the insurer is not liable; (2) where the only damages sought for an insurer's bad faith are from loss of lien value, full repayment of the loans forecloses recovery, because the liens themselves have no intrinsic value; and (3) the collateral source rule does not apply to exclude evidence of loan repayments by third parties where those repayments are central to the questions of insurance coverage and liability.

**BACKGROUND**

¶3        In 2007 and 2008, ML loaned about $165 million to Tempe Land Company, LLC ("TLC") to construct a residential condominium project ("Centerpoint"). ML secured its loan with a deed of trust on the Centerpoint property and purchased a lender's title insurance policy from Fidelity National Title Insurance Company ("Fidelity") to insure lien priority of the deed of trust.

_____

[1] Although Justice Robert M. Brutinel (Ret.) retired before issuance of this opinion, he participated in oral argument and throughout preparation of this opinion. Justice King is recused from this matter. Pursuant to article 6, section 3 of the Arizona Constitution, Justice Rebecca White Berch (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

¶4 Starting in April 2008, various contractors and subcontractors began recording mechanics' liens against the Centerpoint property (the "Mechanics' Liens"). This led to the consolidated litigation of claims in which the claimants sought both a determination that the Mechanics' Liens had priority over ML's security interest in the Centerpoint property and foreclosure on the Centerpoint property.

¶5 In June 2008, ML entered involuntary bankruptcy proceedings. Pursuant to a court-ordered bankruptcy reorganization plan, numerous limited liability companies were created to hold assets securing ML's fifty outstanding loans, including the TLC loan. These holding companies were managed by ML Manager, LLC ("ML Manager"). The LLCs that held ML's Centerpoint-related assets were Centerpoint I Loan, LLC ("CPI") and Centerpoint II Loan, LLC ("CPII"), which we refer to collectively as the "Loan LLCs." The Loan LLCs were assigned a large percentage of the interest in the ML deed of trust for Centerpoint. Remaining interests in the loans and ML deed of trust were held by eight fractional interest holders (the "Pass-Through Investors"). We refer to ML Manager, the Loan LLCs, and the Pass-Through Investors as the "ML Investors."

¶6 Without funding from ML, the Centerpoint project stalled, and in December 2008, TLC filed for bankruptcy protection. The Loan LLCs were its largest creditors. In January 2010, the Loan LLCs and Pass-Through Investors foreclosed on Centerpoint and ultimately purchased the property at a trustee's sale for $8 million, but the Mechanics' Liens were not extinguished.

¶7 Universal-SCP 1 Limited Partnership ("Universal") provided a $20 million loan to ML Manager, the Loan LLCs, and the Pass-Through Investors for bankruptcy exit costs. Universal secured its loan with deeds of trust on Centerpoint and other assets owned by the Loan LLCs. Universal obtained a $5 million title insurance policy from Commonwealth Land Title Insurance Co. ("Commonwealth"). This policy insured the priority of Universal's deed of trust on Centerpoint only as against "any other lien or encumbrance."

¶8 During this time, the Loan LLCs purchased land adjacent to Centerpoint, financed by a $5 million loan from VR CP Funding ("VRCP"). VRCP was a single-purpose entity, formed solely to provide this loan,

which was secured with a deed of trust on the adjacent lot and Centerpoint. Commonwealth insured VRCP's deed of trust with a $5 million title insurance policy. This policy insured priority of VRCP's deed of trust in second position behind Universal's deed of trust. The Loan LLCs also procured an owner's title insurance policy from Fidelity for their purchase of the adjacent lot.

¶9            Commonwealth's title insurance policies insured that Universal and VRCP's mortgage liens had priority over other liens against the Centerpoint project. But when Commonwealth issued the Universal and VRCP policies, there were more than $30 million in Mechanics' Liens recorded against Centerpoint.

¶10            After the holders of the Mechanics' Liens sued to enforce their liens, ML Manager (acting for the Loan LLCs and the Pass-Through Investors) tendered the defense of these lien claims to Fidelity. In September 2009, Fidelity accepted the defense with a general reservation of rights to later contest coverage, and Fidelity engaged counsel to represent ML Manager. *Centerpoint Mech. Lien Claims, LLC v. Commonwealth Land Title Ins. Co. ("Centerpoint III")*, 255 Ariz. 261, 266 ¶ 10 (App. 2023); *Fid. Nat. Title Ins. Co. v. Centerpoint Mech. Lien Claims, LLC ("Centerpoint I")*, 238 Ariz. 135, 138 ¶ 9 (App. 2015).

¶11            In January 2010, ML moved for summary judgment on the issue of lien priority, seeking a judgment that its mortgage loan, which was secured by the ML deed of trust, was senior to the Mechanics' Liens. In September 2010, the trial court denied the motion, reasoning that a jury could find that ML's mortgage loan was not equitably entitled to priority over the Mechanics' Liens because ML did not fully fund its loan to TLC, which prevented TLC from paying its subcontractors. Thereafter, Fidelity reasserted its reservation of rights as to the ML policy (held by the Loan LLCs).

¶12            Also in September, the Loan LLCs contracted to sell Centerpoint. *Centerpoint III*, 255 Ariz. at 267 ¶ 16. However, that sale "failed to close in October as planned, at least in part due to Fidelity's decision . . . not to provide a title policy to the buyer that would insure priority over the [M]echanics' [L]iens." *Centerpoint I*, 238 Ariz. at 138–39 ¶ 12.

¶13 Notwithstanding the failed October 2010 closing, the buyer still wanted to purchase Centerpoint—it just needed title insurance, which was difficult to obtain due to the recorded Mechanics' Liens. *See Centerpoint III*, 255 Ariz. at 267 ¶ 19. The parties extended the closing deadline to early November. *Id.* Counsel for ML Investors, acting under authority from Universal and VRCP, urged Fidelity National Title Group ("FNTG")—the parent corporation to both Fidelity and Commonwealth—to provide the contemplated title insurance policy to the buyer. *Id.* ¶¶ 19–20. Fidelity, however, refused, and the Centerpoint sale again failed to close. *Id.* ¶ 20.

¶14 The ML Investors, Universal, and VRCP feared losing their entire $120 million investment and also feared the prospect that their title insurers would decline coverage. The Mechanics' Liens claimants would only settle for cash and were uninterested in receiving an assignment of claims against Fidelity. Thus, the Loan LLCs and Pass-Through Investors found a buyer willing to pay $30 million for the Centerpoint property with the sale contingent upon the buyer obtaining satisfactory title insurance. But Fidelity refused to issue title insurance to the buyer, and the buyer refused to purchase Centerpoint.

¶15 In November 2010, Universal and VRCP tendered formal defense to Commonwealth pursuant to the Universal and VRCP policies. Commonwealth acknowledged receipt of the claims, and, in December 2010, it ultimately accepted Universal and VRCP's offer to defend under a general reservation of rights. *Id.* ¶¶ 21–23. Around that time, Fidelity also accepted the defense of the Loan LLCs with a reservation of rights.

¶16 Starting in October 2010, after the first failed closing, ML Manager notified Fidelity that it would seek a *Morris* agreement with the Mechanics' Liens claimants for a payment of the Mechanic Liens, which totaled about $30 million. *See United Servs. Auto. Ass'n v. Morris*, 154 Ariz. 113 (1987). In January 2011, Universal and VRCP sent a demand letter to Commonwealth stating "that they had 'entered into negotiations with and intend[ed] to consummate agreements with the mechanic lien holders.'" *Centerpoint III*, 255 Ariz. at 268 ¶ 24 (alteration in original). But the letter "also stated [that Universal and VRCP] would not enter into any settlement if Commonwealth withdrew its reservation of rights" while threatening to enter a *Morris* agreement. *Id.*

¶17          In February 2011, ML Manager, the Loan LLCs, Universal, VRCP, and the Mechanics' Liens claimants entered into the *Morris* agreement—which would become effective once the trial court accepted it—and completed the sale of Centerpoint to ZarCalRes Tempe, LLC (the "Buyer") for $30 million.  To ensure that the Buyer could purchase title insurance, the *Morris* agreement established a way to guarantee that no existing lienholder would foreclose on Centerpoint after the sale.

¶18          To execute the *Morris* agreement, a new entity, Centerpoint Mechanic Lien Claims, LLC ("CMLC"), was created.  The *Morris* agreement required that CMLC use approximately $13.5 million of the sale's proceeds to purchase all of the Mechanics' Liens claims.  CMLC and the Buyer then entered into a subordination agreement and a covenant not to sue or execute, with CMLC promising not to execute on the Centerpoint property against the Buyer or the Buyer's assigns and successors.  Importantly, Universal and VRCP agreed to relinquish their respective rights to demand payment of their $5 million loans from the sale's proceeds.  Instead, Universal and VRCP subordinated their interests in the agreement to those of the Buyer and the Buyer's assigns and successors.  Additionally, Universal and VRCP promised not to execute on the Buyer or its assigns and successors.

¶19          For Universal and VRCP's part in the *Morris* agreement, they were paid a little over $4 million and $5.8 million, respectively, from the sale's proceeds.  Universal ultimately received payment in full for its loans to the Loan LLCs and Pass-Through Investors, as Universal had secured its loan with other properties that were subsequently sold.  VRCP was not directly repaid from the sale's proceeds.  Instead, VRCP's members sold their ownership interests to CPII (99%) and CMLC (1%) in amounts equal to the principal and interest owed on the VRCP loan.  Whether these payments constituted "loan repayments" was disputed.  Notably, Universal and VRCP's deeds of trust were not released.

¶20          After the *Morris* agreement, "CMLC substituted itself for the [M]echanics' [L]ien claimants in the ongoing litigation," and Fidelity and Commonwealth challenged the agreement.  *Centerpoint I*, 238 Ariz. at 139 ¶ 18.  The trial court validated the agreement, finding it neither fraudulent nor collusive, and decided that the settlement amount was reasonable.  *Id.* Fidelity, but not Commonwealth, appealed.  *Id.* at 140 ¶ 19.

¶21 The court of appeals invalidated the *Morris* agreement, finding that (1) the interests of Universal, VRCP, the Loan LLCs, and CMLC "were aligned, not divergent," (2) there was "no risk of excess liability for the insureds" once the Mechanics' Liens claims were unconditionally settled for a fixed sum, and (3) the agreement exceeded "Fidelity's indemnity obligation." *Id.* at 141 ¶¶ 29–30, 142 ¶¶ 35–36. But because Commonwealth failed to appeal, the "*Morris* judgment remain[ed] in effect as against Commonwealth." *Id.* at 142 ¶ 39.

¶22 The present action stems from Commonwealth's conclusion that Universal and VRCP were not covered by the title policy for their purported losses as set forth in the *Morris* agreement. CMLC counterclaimed, alleging that Commonwealth breached the $5 million policies with Universal and VRCP and had done so in bad faith. Specifically, CMLC alleged that Commonwealth breached the Universal and VRCP policies by failing to provide full insurance coverage as required by the title policy when it failed to settle the Mechanics' Liens or defend against them. Similarly, CMLC alleged that Commonwealth engaged in bad faith by refusing to indemnify Universal and VRCP against the Mechanics' Liens, refusing to withdraw its reservations of rights without a reasonable basis, engaging in dilatory claims handling practices, refusing to participate in settlement negotiations, misrepresenting its insureds' rights under the insureds' policies, and forcing its insureds to engage in litigation to obtain benefits due under the policies. CMLC sought both compensatory and punitive damages.

¶23 In 2015, the trial court granted Commonwealth's motion for summary judgment on CMLC's breach of contract claim because two conditions of the policy, conditions 8(a)(ii) and 10(b), precluded coverage if the insured loans had been fully repaid. The trial court reasoned that the VRCP loan was fully repaid, despite being termed "a 'payment for partners' interests,'" because (1) the purported purchase price was the exact amount of the loan, and (2) the payment "was initially described as a 'payoff'" but was "later changed to 'payment for partners' interests.'" The court concluded that the depiction of the transaction as a purchase of VRCP rather than a loan payoff was a mere "artful pretense."

¶24 Eventually, the case proceeded to trial on one remaining claim: CMLC's bad faith claim against Commonwealth on the Universal and VRCP policies. Before trial, however, the court denied CMLC's motion in limine to exclude evidence of the loan repayments made to Universal and

VRCP. The court reasoned that the loan repayments were not paid by a collateral third party but were "part of the benefit bargained for by the parties," and thus the collateral source rule was inapplicable. The court similarly denied Commonwealth's motion to exclude evidence of CMLC's damages, notwithstanding the fact that Universal and VRCP were fully repaid their loans, because Universal and VRCP asserted that they nonetheless suffered pecuniary damages. This permitted CMLC to present evidence of the diminution in value of the Centerpoint property caused by the Mechanics' Liens and to argue that this diminution resulted in pecuniary losses, which were needed to sustain the bad faith claim.

¶25 During trial, CMLC argued that Universal and VRCP suffered $19.5 million of damages due to Commonwealth's bad faith because the $38 million Mechanics' Liens had priority over their loans, rendering the deeds of trust securing the loans valueless. Despite the trial court's ruling on Commonwealth's motion for summary judgment that VRCP had been fully repaid for its loan, CMLC repeatedly argued that the loan was not repaid. CMLC also argued that because the October 2010 sale did not go through, Universal and VRCP suffered a loss.

¶26 The jury returned a $5 million verdict in favor of CMLC for damages suffered due to Commonwealth's bad faith. Commonwealth submitted a motion for renewed judgment as a matter of law, arguing that neither Universal nor VRCP presented evidence that they suffered a loss due to its alleged bad faith. CMLC moved for a new trial on the issue of damages, arguing that the collateral source rule should have barred evidence of Universal and VRCP's loan repayments and that the jury should have been instructed on punitive damages. The trial court denied both motions and awarded CMLC attorney fees as the successful party pursuant to A.R.S. § 12-341.01. *Centerpoint III*, 255 Ariz. at 269 ¶ 38. Both parties appealed. *Id.* ¶ 39.

¶27 The court of appeals vacated the trial court's entry of partial summary judgment in favor of Commonwealth on the breach of contract claims and remanded to the court with instructions to enter summary judgment in favor of CMLC for $10 million. *Id.* at 272 ¶ 52. The court reasoned that conditions 8(a)(ii) and 10(b) of the insurance contracts "do not provide or define coverage defenses, but instead operate as defenses to payment liability." *Id.* at 271 ¶ 48; *see also id.* ¶ 49 (providing that the exclusive coverage defenses pursuant to the policies were listed in the "exclusions from coverage" and "exceptions from coverage" sections of the

policies). Thus, because the court-approved *Morris* agreement "is final and binding against Commonwealth as to both the fact and amount of" liability, and because none of the coverage exclusions in the policy exempted Commonwealth's coverage of the Mechanics' Liens, the court held that Commonwealth had breached the insurance contracts. *Id.* at 271–72 ¶¶ 48–52.

¶28 The court of appeals affirmed the trial court's denial of Commonwealth's motion for judgment as a matter of law on the bad faith claim. *Id.* at 277 ¶ 75. Commonwealth argued that CMLC suffered no damage, as a matter of law, because "the evidence unequivocally establishes" that Universal and VRCP were repaid. *Id.* at 276 ¶ 71. In response, the court of appeals concluded that "trial evidence and the parties' briefs make clear that" there was a disputed issue of material fact as to whether VRCP's loan was repaid. *See id.* ¶¶ 71, 73–74 (noting that Universal "was fully repaid from other security" but that VRCP's payment could be characterized as a payment of partnership interest and to purchase claims against Commonwealth). The court of appeals reasoned that the conflicting evidence was resolved by the jury, and that the jury's $5 million award to CMLC for Commonwealth's bad faith claim was therefore supported by the evidence. *Id.* ¶ 75.

¶29 The court of appeals also upheld the trial court's admission of evidence that Universal and VRCP had been repaid their loans and, confusingly, stated that "Universal and VRCP received full repayment of their loans." *Id.* at 273 ¶¶ 56, 58. The court concluded that the collateral source rule was inapplicable because the "loan repayments were not the result of the intrusion of a stranger," i.e., a collateral source, but rather resulted from the debtors' (the Loan LLCs' and CMLC's) repayment of the loans covered by the insurance policy. *Id.* ¶¶ 56–58. The court reasoned that because CMLC's payments to Universal and VRCP were not wholly independent from the transaction for which Universal and VRCP could claim an injury, CMLC was not a collateral source, and the collateral source rule was therefore inapplicable. *Id.*

¶30 Lastly, the court of appeals vacated the trial court's award of attorney fees to CMLC until after that court resolved the remaining issues on remand. *Id.* at 277 ¶¶ 77–78.

**DISCUSSION**

**¶31**        We granted the petition and cross-petition for review presenting the following questions of statewide importance.  (1) May the insurer contest coverage for the insured lenders' title insurance claims based on policy provisions stating (a) that the insurer's liability for loss or damage shall not exceed the indebtedness owed to the insured and (b) that there is no coverage for title defects or liens resulting in no loss to the insured?  (2) Where loans secured by a deed of trust are repaid, can an alleged diminution in value of the insured deed of trust constitute actual pecuniary damage to the insured lender to support a bad faith claim? (3) Does the collateral source rule preclude evidence of the sources of loan repayment in these circumstances?

**¶32**        As this matter was resolved on motions for summary judgment and judgment as a matter of law, our review of the decisions below is de novo, "viewing the evidence in the light most favorable to the party against whom summary judgment was entered," *Bridges v. Nationstar Mortg. L.L.C.*, 253 Ariz. 532, 534 ¶ 7 (2022) (motion for summary judgment), and "viewing the evidence in the light most favorable to Plaintiffs," *Torres v. JAI Dining Servs. (Phx.) Inc.*, 252 Ariz. 28, 30 ¶ 9 (2021) (motion for judgment as a matter of law).

**I.        COVERAGE WHERE LOANS WERE REPAID**

**¶33**        Title insurance differs from other types of insurance in that it insures against harms that exist at the time the policy is issued, that is, indemnifying against loss from title defects and encumbrances.  *See First Am. Title Ins. Co. v. Johnson Bank*, 239 Ariz. 348, 354–55 ¶¶ 31–33 (2016). Central to the resolution of the dispute here is the recognition that not all title insurance policies are the same.  Courts have frequently distinguished between owner and lender policies.  "Defining and measuring actual loss under a title insurance policy is not the same for the owner who has title to property, and a mortgagee who holds only a security interest in the borrower's title."  *Blackhawk Prod. Credit Ass'n v. Chi. Title Ins. Co.*, 423 N.W.2d 521, 525 (Wis. 1988).  While "an owner-insured is entitled to the full market value of the property, a value that is immediately diminished by the presence of title defects," a "mortgagee-insured's loss cannot be determined unless the note is not repaid and the security for the mortgage proves inadequate."  *Falmouth Nat'l Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1063 (1st Cir. 1990) (*citing Blackhawk*, 423 N.W.2d at 525).

**¶34** The policy here illustrates this distinction. The parties agree that the policy does not guarantee the loan, but only the priority of the deed of trust over encumbrances existing at the time the policy was issued, such as the Mechanics' Liens here. The policy specifically lists in section 3 as "Exclusions From Coverage," any "[d]efects, liens, encumbrances, adverse claims, or other matters . . . (c) resulting in no loss or damage to the Insured Claimant[.]" Under "Conditions," section 8(a) provides: "The extent of liability of the Company for loss or damage under this policy shall not exceed the least of . . . (ii) the Indebtedness[.]" In turn, the policy sets forth a definition of "indebtedness" in Conditions section 1(d), which provides that "(ix) . . . the Indebtedness is reduced by all payments[.]" Condition 10(b) provides that "[t]he voluntary satisfaction of the Insured Mortgage shall terminate all liability of the company[.]" Thus, the policy excludes coverage if the insured has suffered no loss or damage, and it expressly limits coverage to any actual, unreimbursed indebtedness.

**¶35** As the Loan LLCs and Pass-Through Investors were attempting to sell the Centerpoint property and discharge the Mechanics' Liens, the insureds filed a claim under the policy. Commonwealth opted to defend the insureds in the existing declaratory judgment action to establish lien priority, but only under a reservation of rights. As a consequence, the insureds proceeded to resolve the liability issues—i.e., priority of the deeds of trust and related issues—through the *Morris* agreement.

**¶36** *Morris* agreements typically come into play in liability actions when an insurer defends an insured under a reservation of rights. *See Safeway Ins. Co., Inc. v. Guerrero*, 210 Ariz. 5, 9 ¶ 9 (2005). Such agreements recognize that an insurer's reservation of rights places the interests of the insurer and insured in a potential conflict, because if the insured is found to be liable, the insurer can then contest coverage, and the insured will have no recourse. *See Parking Concepts, Inc. v. Tenney*, 207 Ariz. 19, 22 ¶ 12 (2004). This Court has ruled that such a situation gives "the insurer a double bite at escaping liability." *Morris*, 154 Ariz. at 118.

**¶37** Under those circumstances, upon notice to the insurer and subject to court approval, the insured may settle the questions of liability and damages with a third-party plaintiff. *Quihuis v. State Farm Mut. Auto. Ins. Co.*, 235 Ariz. 536, 539 ¶ 4 (2014); *Morris*, 154 Ariz. at 119. So long as the agreement is reasonable and not collusive—which the insurer may contest

during the *Morris* proceedings—the agreement will bind the insurer as to liability and the damages amount. Once the *Morris* agreement is approved by the court, the insurer may not litigate the fact and amount of the insured's liability, but it may contest coverage under the policy, because otherwise the insurer may be required to provide coverage the insured did not purchase. *Quihuis*, 235 Ariz. at 541 ¶ 12; *Morris*, 154 Ariz. at 119–20. That question—whether the insurer is contesting liability or coverage—is central to the dispute here.

**¶38** The agreement here is different from a typical *Morris* agreement because it does not resolve a third-party claim asserting a damages claim against the insured, but instead arises from a first-party agreement. However, Arizona courts have held that parties in similar circumstances may make such agreements and *Morris* principles will apply. *See, e.g.*, *Apollo Educ. Grp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 250 Ariz. 408, 414 ¶¶ 26–27 (2021) (acknowledging that the operative question is whether the insurer had a duty to defend but also reserved the right to deny coverage—not whether a first- or third-party claim is at issue). No party contends that the *Morris* agreement here is inappropriate and unenforceable, and therefore we do not address whether *Morris* agreements are generally appropriate in the first-party context.

**¶39** However, the difference between a third-party and a first-party *Morris* agreement can give rise to confusion because the concept of liability differs in those two circumstances. In a third-party agreement, the liability is to the third-party claimant, and the resolution of that liability within the *Morris* agreement is binding on the insurer and cannot subsequently be challenged. With a first-party *Morris* agreement, the "liability" is to the insured under the policy, so that the concepts of liability and coverage necessarily overlap. That is what happened here and, in our view, led to an erroneous legal conclusion by the court of appeals.

**¶40** In *Quihuis*, this Court recognized that *Morris* "does not preclude litigation of whether coverage exists under the policy," but "an insurer in a coverage action may not, in the guise of a coverage defense, litigate what are *essentially and solely* liability issues" resolved by the *Morris* agreement. 235 Ariz. at 538 ¶¶ 1–2 (emphasis added) (citing *Associated Aviation Underwriters v. Wood*, 209 Ariz. 137, 150 ¶ 37 (App. 2004)). The Court observed that *Morris* "does not preclude litigation of pure coverage

issues," including factual issues that affect liability or independently control coverage. *Id.* at 541 ¶ 15.

**¶41** Applying those principles, the court of appeals held that "conditions 8(a)(ii) and 10(b) do not provide or define coverage defenses, but instead operate as defenses to payment liability." *Centerpoint III*, 255 Ariz. at 270 ¶ 41, 271 ¶ 48. Thus, the court concluded that "for purposes of this case, the fact and amount of Commonwealth's liability . . . may not be relitigated, since it is bound by the *Morris* Judgment." *Id.*

**¶42** The court of appeals misreads *Quihuis*, which holds that a *Morris* agreement is binding on the insurer as to "the existence and extent of *the insured's liability*." 235 Ariz at 541 ¶ 13 (emphasis added). Here, the *Morris* agreement did not resolve claims as to third parties. In other words, the insured had no liability to anyone. In this first-party agreement, the only liability is Commonwealth's if it breached the policy terms by failing to defend the insureds. Thus, coverage and liability here are coextensive.

**¶43** Indeed, the policy essentially uses the terms "coverage" and "liability" interchangeably. Exclusion 3(c) is listed under the caption "Exclusions From Coverage," and excludes liens and encumbrances "resulting in no loss or damage to the Insured Claimant." Thus, Commonwealth's assertion that the insureds sustained no loss is an argument against coverage, because if there is no loss, there is no coverage. *See* A.R.S. § 20-1562(8) (loss is a coverage, not a liability issue). Similarly, the other pertinent policy provisions are conditions of coverage, even though those provisions sometimes use the term "liability." *See, e.g.*, Condition 10(b) ("The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company[.]"); Condition 8(a) (the insurer is obligated to pay the "least" among multiple values, including indebtedness).

**¶44** The policy expressly limits coverage to damages sustained because of subordination of the mortgage to other liens and encumbrances, and only to the extent that the mortgage remains unpaid. The nature of the insurance policy—lender title insurance—in turn defines the scope of a possible *Morris* agreement, which is limited to the fact and amount of the insured's liability, and not to whether the loss is covered by the insurance policy. The only "liability" that was resolved by the *Morris* agreement pertained to lien priorities, which Commonwealth does not contest here.

¶45        That leaves the question of whether the mortgage was not fully repaid, which is the only damage alleged by the insureds.[2]  Because the court of appeals held that Commonwealth was precluded as a matter of law from contesting the question of insurer liability to the insureds, it did not reach this question and instead directed the trial court on remand to enter summary judgment in favor of CMLC for breach of contract.  *See Centerpoint III*, 255 Ariz. at 270 ¶ 41, 272 ¶ 52.  But because we conclude that Commonwealth properly challenged coverage, that coverage hinges upon whether the insureds sustained damage through the unpaid mortgage.

¶46        The trial court considered this question, however, and found that the mortgage was repaid in full from the "purchase" of VRCP, which, based on the evidence, it concluded was actually a loan payoff.  Indeed, it was initially characterized in the draft closing documents as a "payoff," but later changed to "payment for partners' interests" in VRCP.   The payment—$5.88 million—exactly matched the amount of the debt.  The trial court deemed calling the payoff of the lien payment for partners' interests an "artful pretense," noting that "[a]llowing a lender to manipulate and extend mortgage insurance by agreeing to term the repayment of its loan" in that manner would have "dangerous and far-reaching consequences," derailing an insurer's ability to project its costs and accurately price its insurance, and extending coverage beyond the scope agreed to by the parties.  As a result, VRCP "owed nothing on the loan, as the full debt had been paid.  Condition 8(a)(ii) and Condition 10(b) both preclude coverage in such a case."

¶47        We conclude that uncontroverted evidence supports the trial court's conclusion that the "purchase" of VRCP was actually a loan repayment, and that the insureds therefore suffered no damages covered under the policy.

¶48        We therefore vacate the court of appeals opinion on this question and affirm the trial court's grant of summary judgment to Commonwealth on the breach of contract claim.

---

[2] We do not separately analyze Universal's claims in this regard because it was fully repaid from proceeds from the sale of property.  *Supra* ¶ 19.

## II.  DIMINUTION IN LIEN VALUE AS ACTUAL PECUNIARY LOSS

¶49	CMLC also asserts bad faith on the part of Commonwealth because of the insurer's decision to defend only under a reservation of rights. "To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190 (1981) (internal quotation marks omitted) (quoting *Anderson v. Cont'l Ins. Co.*, 271 N.W.2d 368, 376 (Wis. 1978)).

¶50	The trial court found bad faith and allowed the jury to determine damages. It awarded VRCP $5 million dollars. The court of appeals concluded that there was sufficient evidence to support this award and that the trial court did not err by refusing to enter a directed verdict. *Centerpoint III*, 255 Ariz. at 265 ¶ 2.

¶51	Commonwealth contests the finding of actual damages. CMLC claims that it is entitled to bad faith damages for Commonwealth's failure to repay the loans. However, our conclusion in Part I of this opinion forecloses CMLC's argument. The loans were fully repaid and, therefore, VRCP and Universal suffered no covered loss.

¶52	CMLC also contends that the value of VRCP and Universal's liens was diminished. CMLC provided no authority for the proposition that the liens have intrinsic value. The insurance coverage was for priority of liens only, and because the liens were repaid, Commonwealth's bad faith resulted in no damages. *See, e.g.*, *Falmouth*, 920 F.2d at 1063 (holding that "a mortgagee-insured's loss cannot be determined unless the note is not repaid and the security for the mortgage proves inadequate"); *Twin Cities Metro-Certified Dev. Co. v. Stewart Title Guar. Co.*, 868 N.W.2d 713, 718 (Minn. Ct. App. 2015) (to the same effect); *Karl v. Commonwealth Land Title Ins. Co.*, 24 Cal. Rptr. 2d 912, 917 (Cal. Ct. App. 1993) (to the same effect); *Green v. Evesham Corp.*, 430 A.2d 944, 946 (N.J. Super. Ct. App. Div. 1981) (to the same effect).

¶53	Although Commonwealth engaged in bad faith for failing to defend without reservation, CMLC proved no damages and therefore cannot recover. For the foregoing reasons, we reverse the decisions of the court of appeals and trial court on the bad faith damages award.

### III.   COLLATERAL SOURCE RULE

**¶54**        CMLC argues that the trial court should have applied the collateral source rule to preclude evidence of loan repayment. The court of appeals disagreed and affirmed the trial court's admission of such evidence. *See Centerpoint III*, 255 Ariz. at 273 ¶¶ 56–58.

**¶55**        The collateral source rule is usually applied in personal injury cases and holds that although payments by a tortfeasor to the injured party reduce the tortfeasor's liability, payments from third parties—collateral sources—do not, and evidence of such collateral sources should not be considered. *See Michael v. Cole*, 122 Ariz. 450, 452 (1979); Restatement (Second) of Torts § 920(A) (Am. L. Inst. 1979). However, to preclude evidence of payments, those collateral sources must be "wholly independent" of the wrongdoer. *See Hall v. Olague*, 119 Ariz. 73, 73 (App. 1978).

**¶56**        We agree with the court of appeals that "[t]he loan repayments were not the result of the intrusion of a stranger into Commonwealth's and CMLC's relationship," but rather they were "an intrinsic and integral part of the same transaction." *Centerpoint III*, 255 Ariz. at 273 ¶ 56. Thus, "CMLC seeks an inverted application of the rule," allowing investors' payments to be shielded from consideration as to the insurer's liability. *Id.* ¶ 57.

**¶57**        Given that the loan repayments are central to the insurer's liability, and that CMLC sought damages for bad faith only to the extent of economic loss from the liens, the collateral source rule does not apply. *See, e.g.*, *FDIC v. United Pac. Ins. Co.*, 20 F.3d 1070, 1083 (10th Cir. 1994) (holding that collateral source rule does not preclude evidence of a third-party settlement pertaining to "common damages"); *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 653 F.3d 1121, 1136 (10th Cir. 2011) (applying same rule pertaining to settlement of the "same transaction"); *Crowley v. Tr. Co. Bank of Cent. Ga.*, 466 S.E.2d 24, 26 (Ga. Ct. App. 1995) (holding that the collateral source rule does not exclude evidence of payments made as "security for the same loan"). Applying the rule would unfairly deprive a jury of relevant—indeed, here, dispositive—evidence.

**¶58**        We therefore affirm the trial court and court of appeals on this issue.

**ATTORNEY FEES**

**¶59**         CMLC seeks attorney fees pursuant to A.R.S. § 12-341.01.  We deny the request as it is not the prevailing party.

**CONCLUSION**

**¶60**         We vacate the court of appeals opinion except for paragraphs 53–58.   We remand to the trial court to enter summary judgment in favor of Commonwealth on the bad faith claim.